[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1341 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1342 
Elvina R. appeals from an order summarily denying her modification petition under Welfare and Institutions Code section388,[1] and from an order under section 366.26, subdivision (b)(2) identifying adoption as the permanent placement goal for her son Ramone R. and allowing 180 days for finding an appropriate adoptive family. The latter order was premised on a finding that Ramone "has a probability for adoption but is difficult to place," and required the court to proceed with either adoption or legal guardianship as his permanent placement at the end of the 180-day period. (§ 366.26, subd. (c)(3).) Ramone was currently placed in a foster home with a specially trained caretaker to help provide for his medical and other special needs. *Page 1343 
We affirm the denial of the section 388 petition. We reverse the section 366.26, subdivision (b)(2) order because there was no evidence Ramone's adoption was probable. The court abused its discretion by foreclosing long-term foster care as a placement option under the circumstances of this case.
 BACKGROUND
Ramone was born in May 2002. On July 16, 2003, the San Francisco Department of Human Services (DHS) detained Ramone and placed him in emergency foster care after Elvina brought him to an emergency room with severe burns on his lower body. According to the detention report, Elvina claimed the burns occurred while Ramone was with his father's cousin, but this account was soon proven false. (Elvina could not identify the cousin's address, and said the cousin had taken Ramone for a visit with his father in jail, but there was no jail visitation at the time.) Ramone had first degree burns on his torso and right arm, and second and third degree burns on his feet, ankles, and genitals. The burns appeared to be a day or two old and were consistent with immersion in scalding water.
It was discovered that earlier in July, Elvina had taken Ramone to an emergency room in Los Angeles, where it was determined that he needed antibiotics. Elvina did not want him admitted, became belligerent with hospital staff, and fled the hospital with Ramone still attached to an intravenous tube. Ramone had been hospitalized the previous March for an abscess. Elvina had failed to take him for his follow-up appointment, or for his routine immunizations.
Elvina reported that she was unemployed and received only MediCal assistance, but that her sister and cousin were supporting her financially. A sister said she did not know how Elvina was supporting Ramone; she thought they were receiving welfare. Elvina had been removed from her parents' care at the age of 14. She repeatedly left her placements and associated with drug dealers, becoming involved in assaultive robbery and, allegedly, prostitution. She was adjudicated a section 602 ward in December 2000. She was 17 years old when Ramone was born. The social worker reported that Elvina was argumentative and hostile after Ramone was detained.
The disposition report filed in September 2003 stated that Elvina was now claiming Ramone had been with her boyfriend when he was burned. She said the boyfriend, whom she refused to identify, had prepared a bath for Ramone when the child crawled into the tub by himself. However, the burn pattern was consistent with dunking, not crawling. Elvina said she would attend *Page 1344 
parenting classes but refused to undergo substance abuse assessment. There was a warrant for her arrest based on her failure to promptly seek medical care for Ramone's burns. An investigator had reportedly learned that Elvina's boyfriend was also her "pimp," and was "previously involved with another child who died in a bathtub."
Elvina failed to appear for one visit with Ramone, failed to confirm another which was then cancelled, and arrived late for two others. During the first visit, Ramone was hesitant and apprehensive with Elvina, who became "irate and confrontive" when she overheard the social worker talking about discharging Ramone into foster care. At the second visit, Ramone screamed when Elvina tried to restrain him on her lap, and she became visibly frustrated. Elvina left 40 minutes before the scheduled two hours were up. Ramone was discharged from the hospital on August 11, and was doing well in a medically fragile infant (MFI) foster home. He was on antibiotics, and his burn wounds required him to wear compression stockings 24 hours a day. The Department was planning to pursue placement with Shamika L., a paternal cousin.
An addendum report filed in October 2003 stated that Ramone screamed throughout the day and night, as if he were in pain. He had a hard time making eye contact with his caregiver. Shamika L. had been unable to handle him, and he was placed in another MFI home. Elvina had been arrested and jailed after pleading guilty to a charge of child endangerment under Penal Code, section 273a, subdivision (a). DHS recommended that no reunification services be provided to Elvina because of her role in Ramone's severe injuries. (§ 361.5, subd. (b)(5) (6).) The report noted that Ramone's alleged father had an extensive criminal history, and was currently incarcerated for possession of cocaine and a firearm.
In another addendum report filed in December 2003, DHS said it had decided to place Ramone with a maternal aunt, Eva R., "the only relative assessed without a criminal or child abuse history." A gradual transition was contemplated. During the combined jurisdiction and disposition hearing in mid-December, Elvina filed a waiver of her right to reunification services. The court took jurisdiction over Ramone, continued his foster care placement, and scheduled a hearing under section 366.26.
DHS filed a section 366.26 report in March 2004. Long-term foster care was the proposed permanent plan. Ramone, though still "very needy, both emotionally and physically," was said to be thriving in his MFI foster home. An old fracture had been discovered in his right arm. He was prone to angry *Page 1345 
tantrums, and did not sleep at night; instead, he banged his head, kicked, screamed, and removed his clothes and bedding and threw them on the floor. Eva R. had visited Ramone three times but stopped coming in February, without telling DHS why. Recently, however, she had participated in a meeting at which a renewed visitation plan was discussed. If everything was going well by a scheduled visit on April 20, placement with her was planned. Elvina was in jail and the criminal court had ordered her to stay away from Ramone.
An addendum report filed in May 2004 stated that Eva R. had made one visit, come at the wrong time for another, and never returned since or communicated with the social worker. Nevertheless, DHS now recommended that the court find a probability of adoption, with a 180-day continuance to find an adoptive home. Ramone's arm had been examined and it was decided not to re-break and re-set it, though such a procedure might be necessary when he was 4 years old. DHS reported that he "continued to thrive" in the MFI home, but he also continued to exhibit all the symptoms noted in the previous report.
In June, DHS moved to "suspend" Elvina's visitation, though she had not seen Ramone since the previous August. Elvina had been released from jail on May 9, and a condition of her probation was that she have no contact with Ramone. The social worker, Karan Sjolin, reported that in addition to his head banging and violent tantrums, Ramone's emotional problems included playing with his feces.
The section 366.26 hearing was continued to August 23, 2004. On August 10, Elvina filed her modification petition under section 388. She requested reunification services, based on the following changed circumstances: she was no longer incarcerated; she had successfully completed anger management and parenting classes; she was trying to enroll in individual therapy; she would like to reunify with Ramone and was willing to provide him with a stable permanent home; there were no other identified persons willing to provide him with a permanent home; she could give Ramone's providers insight into his "unique personality, and his likes and dislikes;" she was willing to help transport Ramone and participate in his services; and Ramone would benefit from consistent contact with her.
At the beginning of the August 23 hearing, the commissioner summarily denied Elvina's modification petition, ruling she had failed to make a prima facie showing of changed circumstances that might justify finding reunification services would be in Ramone's best interest. *Page 1346 
Two witnesses then testified, Karan Sjolin and Judy Pekarsky. Dr. Pekarsky was the clinical psychologist who supervised Ramone's therapist, a psychology intern who was a doctoral student. Dr. Pekarsky had never actually met Ramone or his foster mother. Her direct testimony consisted of an offer of proof read into the record by counsel for DHS. This testimony related that the foster mother reported prolonged tantrums and smearing of feces when Ramone was alone in his crib. Dr. Pekarsky observed: "Ramone's behavior problems indicate that the ordinary events of his daily life are experienced as difficult and highly distressing for him. The contributors to Ramone's difficulties are doubtless complex and still not entirely clear. His extremely traumatic experience surrounding the burn he received and the lengthy painful and frightening medical treatment for it have certainly been highly influential in creating Ramone's anxiety and wariness."
Dr. Pekarsky noted that beginning in September, Ramone would have weekly individual visits with a psychologist, and sometime in the next two months a developmental neuropsychologist would begin an assessment to "clarify" his "constitutional developmental and cognitive capacities and vulnerabilities." She added: "It is clear that at twenty-seven months Ramone has already experienced significant traumas and difficulties and is showing obvious behavioral problems and symptoms. At this point, the introduction of any new experience which is likely to be confusing or to provoke strong feelings such as visits with [Elvina] may be expected to increase Ramone's distress."
On cross-examination, Dr. Pekarsky was asked whether it would be unlikely that an adoptive family would be found for Ramone. She replied: "I don't think it would be easy. I certainly have been involved in cases where it's happened and was a good thing for the child."
Ms. Sjolin, the social worker, testified that since the plan to place Ramone with Eva R. had fallen through, DHS was exploring the possibility of placing him with Paula H., a paternal cousin. An assessment of Paula H. had not been completed, but she had indicated she was open to adoption "if the father was okay with it." A background check had revealed an outstanding warrant for Paula H., but that had since been "cleared up."
Sjolin said the foster mother reported Ramone continued to have tantrums, bang his head, and play with his feces during the night. He was "standoffish, not wanting to interact," but was "getting better with that." The foster mother was having trouble sleeping because of "the constant head banging" at night. Child care was being provided for Ramone to give the foster mother some respite. A communication evaluation had been done for Ramone a year earlier, concluding he had moderate to severe language delays. Speech *Page 1347 
therapy had been recommended but not provided. Sjolin thought there was a more recent communication assessment, but did not know who performed it and had no report. In her most recent visits with Ramone, at the end of July, he was "extremely limited verbally." Sjolin had never asked Ramone's foster mother whether she was interested in adoption or legal guardianship, because Sjolin didn't feel the foster mother would be interested. She believed it would be detrimental to change Ramone's placement, unless it were to a permanent caregiver. A failed placement would traumatize him further.
In closing arguments, counsel for Ramone conceded it would be difficult to place him, but noted Dr. Pekarsky's testimony that "she couldn't say it couldn't happen." Counsel for the father argued it was premature to make a finding that adoption was probable, in view of Ramone's difficult behaviors and the fact that DHS had not provided a recent speech assessment or developmental evaluation. He asked the court to continue Ramone in his foster placement. Elvina's counsel contended there was no evidence to support a finding that adoption was probable, and asked the court to make a finding under section 366.26, subdivision (c)(1)(C) ("[t]he child is placed in a residential treatment facility, adoption is unlikely or undesirable, and continuation of parental rights will not prevent finding the child a permanent family placement if the parents cannot resume custody when residential care is no longer needed"). Counsel claimed that Eva R. and Elvina's father wanted to be considered for placement.
Counsel for DHS disputed the notion that a child with special needs like Ramone "has no probability of adoption." She asked the court to grant DHS's request for 180 days to "finalize its assessment of the paternal cousin who previously had not been ruled out but whose assessment was stopped because of the bench warrant," which now "seems [to have] been lifted." Counsel noted it was "not . . . until today that we have heard that [the] maternal aunt, . . . Eva R., is again interested," and the "maternal grandfather again today through mother's counsel is letting the Department know about possibly being interested again."
The court ruled that Ramone's adoption was probable, though he would be difficult to place. It said his current problems did not preclude this finding, "because the very argument of some of those that were opposing this recommendation have put forth the names of individuals that are actually interested in adoption." The court was unwilling to "prolong the matter by setting [it] over for a long-term placement." The court agreed with Ms. Sjolin's assessment that changing placements would be harmful for Ramone: "If he's going to be going to a place we feel will be permanent, so be it. We will begin a transition period. We're not going to be bouncing him from place to place, that would be the worst thing that could happen to him." *Page 1348 
The court also granted DHS's visitation motion, finding it would be detrimental to Ramone to have visits with Elvina. Elvina offers no arguments on appeal against this ruling.
 DISCUSSION
1. The Modification Petition
(1) We review the summary denial of Elvina's section 388 petition for abuse of discretion. (In re Brittany K. (2005)127 Cal.App.4th 1497, 1505 [26 Cal.Rptr.3d 487].) Elvina was required to make a prima facie showing of a genuine change of circumstances or new evidence sufficient to justify a finding that providing her with reunification services would be in Ramone's best interest. (Id. at p. 1504; In re Marilyn H.
(1993) 5 Cal.4th 295, 310 [19 Cal.Rptr.2d 544, 851 P.2d 826]; Inre Anthony W. (2001) 87 Cal.App.4th 246, 250
[104 Cal.Rptr.2d 422].) The allegations of her petition were to be liberally construed, but conclusory claims are insufficient to require a hearing. Specific descriptions of the evidence constituting changed circumstances is required. "Successful petitions have included declarations or other attachments which demonstrate the showing the petitioner will make at a hearing of the change in circumstances or new evidence." (In re Anthony W., supra,
87 Cal.App.4th at p. 250.)
Elvina's petition fell well short of establishing the kind of prima facie showing that might have merited a hearing. It was not verified, in violation of section 388, subdivision (a) and rule 1432(a) of the California Rules of Court. Elvina provided no sworn declaration to support her counsel's allegations.
Even taken at face value, those allegations would not amount to a prima facie case for providing reunification services. The fact that Elvina was out of jail was itself not necessarily in Ramone's best interest, given that she had been in jail for her role in his severe burn injuries. Her desire to provide Ramone with a stable home was irrelevant, absent any suggestion she was able to do so. Her insight into his personality was of questionable value, given her history with him and the fact that she had not seen him for a year. Her completion of anger management and parenting classes, which were conditions of her probation, were new circumstances but by themselves did not support a finding that Ramone's interests would be served by beginning reunification services at this late stage in the dependency proceedings. Similarly, Elvina's willingness to participate in services was not a compelling consideration at this point in the process.
(2) On the eve of a section 366.26 hearing, the child's interest in stability is the court's foremost concern, outweighing the parent's interest in reunification. Thus, a section 388 petition seeking reinstatement (or, in this case, *Page 1349 
initiation) of reunification services must be directed at the best interest of the child. (In re Anthony W., supra,
87 Cal.App.4th at p. 250; In re Edward H. (1996)43 Cal.App.4th 584, 594 [50 Cal.Rptr.2d 745]; cf. In re Marilyn H., supra,
5 Cal.4th at p. 309.) Elvina concedes her claim that Ramone would benefit from contact with her is merely conclusory. None of her other unsworn allegations required a hearing to determine if Ramone would benefit from reunification services for him and Elvina.
2. The Section 366.26, Subdivision (b)(2) Order
(3) Section 366.26, subdivision (b) establishes the order of preference for permanent placement orders: (1) termination of parental rights and placement for adoption; (2) identification of adoption as the permanent placement goal, but an extension of no more than 180 days for location of an appropriate adoptive family; (3) appointment of a legal guardian for the child; and (4) placement in long-term foster care, with further periodic review hearings. The option provided in subdivision (b)(2) depends on a finding under section 366.26, subdivision (c)(3) "that termination of parental rights would not be detrimental to the child . . . and that the child has a probability for adoption but is difficult to place for adoption and there is no identified or available prospective adoptive parent."
In such a case, "the court may identify adoption as the permanent placement goal and without terminating parental rights, order that efforts be made to locate an appropriate adoptive family for the child within a period not to exceed 180 days. . . . At the expiration of this period, another hearing shall be held and the court shall proceed pursuant to paragraph (1) or (3) of subdivision (b). For purposes of this section, a child may only be found to be difficult to place for adoption if there is no identified or available prospective adoptive parent for the child because of the child's membership in a sibling group, or the presence of a diagnosed medical, physical, or mental handicap, or the child is the age of seven years or more." (§ 366.26, subd. (c)(3).)
(4) It is noteworthy that only two of the three permanent placement options outlined in section 366.26, subdivision (b) are available if the court makes the findings described in subdivision (c)(3). Before 2004, all three options (adoption, legal guardianship, and long-term foster care) were available under subdivision (c)(3). (See, e.g., In re Amelia S. (1991)229 Cal.App.3d 1060, 1065 [280 Cal.Rptr. 503]; In re Jasmine P.
(2001) 91 Cal.App.4th 617, 620 [110 Cal.Rptr.2d 562].) In 2003, however, the Legislature amended section 366.26, subdivision (c)(3) to eliminate long-term foster care as a possible placement by deleting the reference to paragraph (4) of subdivision (b). The resulting 2004 version of the statute read "the court shall proceed pursuant to paragraph (1), (3), or of subdivision (b)." (Stats. 2003, *Page 1350 
ch. 813, § 7.) The Legislature corrected the amendment the next year to refer to "paragraph (1) or (3) of subdivision (b)." (Stats. 2004, ch. 810, § 5; see Historical and Statutory Notes, 73 West's Ann. Welf. Inst. Code (2005 supp.) foll. § 366.26, pp. 214-215.)
DHS contends the section 366.26, subdivision (b)(2) order is not appealable. It relies on In re Jacob S. (2002)104 Cal.App.4th 1011 [128 Cal.Rptr.2d 654], and In re Cody C.
(2004) 121 Cal.App.4th 1297 [17 Cal.Rptr.3d 928]. In Jacob S.,
which arose before the statutory amendments noted ante, the court held that a finding under section 366.26, subdivision (c)(3) does not result in an appealable order, because the court has yet to make a final placement determination. No case law was cited. (In re Jacob S., supra, 104 Cal.App.4th at p. 1019.) InCody C., which arose while the 2004 version of the statute was in effect, the same court reaffirmed the Jacob S. rule, rejecting the appellant's reliance on the contrary holding of Inre Edward H., supra, 43 Cal.App.4th at pp. 590-591. (In re CodyC., supra, 121 Cal.App.4th at p. 1300.) The Cody C. court faulted Edward H. for failing to address the claim that findings made under section 366.26, subdivision (c)(3) are "necessarily interlocutory," and characterized the 180-day period for locating an adoptive family as a continuance of the permanency hearing. (In re Cody C., supra, 121 Cal.App.4th at p. 1301.)
(5) Elvina contends the section 366.26, subdivision (b)(2) order is appealable under Edward H., noting the Cody C. court failed to consider that such an order bars the court from ordering long-term foster care if an adoptive placement is not found in 180 days. We agree with Elvina on this point. As theEdward H. court noted, "[j]uvenile dependency law does not abide by the normal prohibition against interlocutory appeals (Kinoshita v. Horio (1986) 186 Cal.App.3d 959
[231 Cal.Rptr. 241]). . . . [A]ll postdispositional orders in juvenile dependency matters are directly appealable without limitation, except for post-1994 orders setting a section 366.26 hearing. (§ 395, § 366.26, subd. (l).) An appeal from the most recent order entered in a dependency matter may not challenge prior orders for which the statutory time for filing an appeal has passed. (In reElizabeth M. (1991) 232 Cal.App.3d 553, 563
[283 Cal.Rptr. 483].)" (In re Edward H., supra, 43 Cal.App.4th at pp. 590-591.) These are well-established propositions. (E.g., In reDaniel K. (1998) 61 Cal.App.4th 661, 667-669
[71 Cal.Rptr.2d 764]; In re Cassandra B. (2004) 125 Cal.App.4th 199, 208
[22 Cal.Rptr.3d 686].)
(6) The exception to the usual rule of postdisposition appealability created by the Jacob S. court may have been a sensible one when it was announced. However, it no longer pertains after the Legislature amended section 366.26, subdivision (c)(3) to remove long-term foster care as a placement option following the 180-day extension for finding an adoptive *Page 1351 
family.[2] The extension can no longer be considered merely a continuance of the original section 366.26 hearing. Interested parties must be given a chance to appeal the court's decision to proceed under section 366.26, subdivisions (b)(2) and (c)(3), in order to protect the child's interest in preserving a stable long-term foster placement in the event that an adoptive family or legal guardian cannot be found within the time permitted. Because the affected children are always "difficult to place for adoption" (§ 366.26, subd. (c)(3)), this is a possibility that cannot be overlooked. The case before us is an excellent example of the undue risk posed to a child when the court proceeds without sufficient evidence that adoption is probable.
(7) Elvina correctly contends the court was required to find a probability of adoption by clear and convincing evidence. Section 366.26, subdivision (c)(3) begins by stating: "If the court finds that termination of parental rights would not be detrimental to the child pursuant to paragraph (1) and that the child has a probability for adoption. . . ." Paragraph (1) of subdivision (c) requires clear and convincing evidence for finding a child likely to be adopted and terminating parental rights. Although the court does not initially terminate parental rights when it proceeds under subdivision (c)(3), the Legislature's incorporation of paragraph (1) in this provision is reasonably understood to include the clear and convincing standard.
(8) We review the court's decision for abuse of discretion. (In re Stephanie M. (1994) 7 Cal.4th 295, 318
[27 Cal.Rptr.2d 595, 867 P.2d 706]; In re Jasmine D. (2000)78 Cal.App.4th 1339, 1351 [93 Cal.Rptr.2d 644]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2004) ¶ 8:99.6, pp. 8-49, 50.) We must accord the trial court a high degree of deference. (Ibid.) (9) Here, however, there was simply no evidence suggesting Ramone would probably be adopted. DHS implicitly concedes the point by offering no argument to the contrary. Nothing in the reports submitted by DHS below or in the testimony of the witnesses at the section 366.26 hearing established a "probability" of adoption in any ordinary sense. The reports described two failed, short-lived attempts to place Ramone with family members. Dr. Pekarsky's testimony provided no more than her opinion that adoption would not be impossible. Ms. Sjolin's testimony established that DHS had recently begun exploring the possibility of placing Ramone with a third relative, Paula H. However, the assessment of Paula H. *Page 1352 
as a potential adoptive parent was incomplete. Ramone's behavioral difficulties were well-documented. His screaming, head-banging, and feces-smearing at night required the provision of respite care even for his MFI foster mother, who was highly experienced in caring for children with special needs. Given these daunting conditions, and DHS's experience with other family members who had earlier expressed interest in taking custody of Ramone, there was no basis for finding a probability that Paula H. would ultimately be able to provide Ramone with a stable, permanent adoptive home. Nor was there anything in the record to indicate that adoption by any other caretaker would be a "probability" within 180 days.
When it made its findings, the court referred to the arguments of counsel suggesting other family members were interested in taking Ramone. These arguments were not evidence, however, and even if credited they established no more than the kind of last-minute volunteerism that is not unusual at section 366.26 hearings. The court was given no reason to believe these candidates (including Eva R., who had failed to follow through on previous attempts by DHS to facilitate a placement) were actually able to provide an appropriate adoptive home. The record strongly suggests that foster care in the MFI home was the only decent care Ramone ever experienced. Without some evidence that care appropriate to his special needs would be available in an adoptive home or the home of a legal guardian, it was an abuse of discretion to proceed under section 366.26, subdivisions (b)(2) and (c)(3), which meant that in 180 days Ramone would no longer be eligible for the kind of expert foster care he was currently receiving.
Elvina argues the court should have invoked the exception to adoptability provided in section 366.26, subdivision (c)(1)(C). That provision requires the court to "find a compelling reason for determining that termination [of parental rights] would be detrimental to the child" because "[t]he child is placed in a residential treatment facility, adoption is unlikely or undesirable, and continuation of parental rights will not prevent finding the child a permanent family placement if the parents cannot resume custody when residential care is no longer needed." We note the court could also have maintained Ramone in long-term foster care subject to further periodic review, under section 366.26, subdivision (b)(4). We refrain from directing the court to exercise its discretion in any particular manner upon remand, however. The court should revisit the full range of options available at a section 366.26 hearing, and make the order best suited to Ramone's needs under current circumstances. *Page 1353 
 DISPOSITION
The order denying the section 388 petition is affirmed. The order under section 366.26, subdivision (b)(2) is reversed.
McGuiness, P.J., and Corrigan, J., concurred.
[1] Further statutory references are to the Welfare and Institutions Code, unless otherwise specified.
[2] We recognize that both the Cody C. court and the trial court in the case before us were presented with the 2004 version of the statute, which did not make it immediately clear that one of the placement options following the 180-day extension had been foreclosed. The legislative directive to "proceed pursuant to paragraph (1), (3), or of subdivision (b)" might reasonably be deemed the result of a printer's error. (Former section 366.26, subd. (c)(3).) The 2005 amendment, however, has made it obvious that only adoption or legal guardianship are permissible placements if the court proceeds under section 366.26, subdivisions (b)(2) and (c)(3). *Page 1354