[No. H028860. Sixth Dist. Dec. 19, 2005.]

In re GABRIEL G. et al., Persons Coming Under the Juvenile Court Law.
SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND
CHILDREN'S SERVICES, Plaintiff and Respondent, v.
STEPHANIE G., Defendant and Appellant.

COUNSEL

Jonathan Grossman, under appointment by the Court of Appeal, for Defendant and Appellant.

Ann Miller Ravel, County Counsel, and Susan S. Ware, Deputy County Counsel, for Plaintiff and Respondent.

OPINION

**PREMO, Acting P. J.**—In this juvenile dependency matter, Stephanie G. (mother) appeals from an order of the juvenile court identifying adoption as the permanent placement goal for her sons Roland and Gabriel and directing the Santa Clara County Department of Family and Children's Services (Department) to attempt to locate an appropriate adoptive family for the children. (Welf. & Inst. Code, § 366.26, subds. (b)(2), (c)(3).)[1] Mother argues that there is insufficient evidence to support the juvenile court's findings that

---

[1] All further statutory references are to the Welfare and Institutions Code. Unspecified subdivision references are to the subdivisions of section 366.26.

the boys are probably adoptable and that they are difficult to place for the reasons specified. The Department urges us to dismiss the appeal, arguing that mother's contentions are premature and that the order is not appealable.

We conclude that the order is an appealable order and, given recent amendments to section 366.26, subdivision (c)(3), mother's appeal is not premature. On the merits, however, we reject mother's contentions and affirm the order.

## I. *Background*

Two-year-old Roland and four-year-old Gabriel lived with mother and their infant half-brother. On March 17, 2004, social workers went to mother's home, found the children abused and neglected, and took them into protective custody. The Department recommended bypassing services to mother due to her previous failure to reunify with two older children. (§ 361.5, subd. (b)(10).) Roland and Gabriel's father waived his right to reunification services. At the disposition hearing on September 16, 2004, the juvenile court denied reunification services, ordered supervised visitation with mother, and set a section 366.26 hearing to select a permanent placement plan for Roland and Gabriel.[2]

Roland and Gabriel both had behavioral problems. They were first placed together in a foster home but soon had to be separated because they fought "viciously" with each other, constantly scratching and punching until they drew blood. Roland was very angry and often had uncontrollable tantrums. During visits with mother the boys were aggressive with each other and with mother. Roland cursed at mother and slapped her in the face. Gabriel sometimes completely ignored her. Mother was usually unable to control them.

In the Department's first report prepared for the section 366.26 hearing, the social worker described Roland as "a cute three-year-old boy, with dark brown eyes and the cutest fade hair cut. He is energetic and playful at times." At other times he was "violent and aggressive." The social worker noted that he "screams, kicks, cusses, and hits and breaks toys that belong to other foster children . . . during his tantrums. During these tantrums Roland hits anyone who is in arms length. Roland also hurts himself by scratching his face." His behavior was such that the foster parent wanted Roland removed from the foster home. The foster parent had agreed to keep him only until a new placement could be located. Roland's behavior also caused him to be removed from two daycare facilities and placed in a therapeutic daycare facility where he could receive one-on-one attention. Roland was healthy,

---

[2] Mother filed a notice of intent to file writ petition (§ 366.26, subd. (*l*)) after the juvenile court set the section 366.26 hearing. Although no petition was ever filed, the record that was generated in response to mother's notice contains some of the factual background pertinent to this appeal. We granted mother's request for judicial notice of the record in that case. (Case No. H027961.)

although he needed dental work that was being deferred until he was older. He was developmentally on target in the areas of height, weight, and motor skills. He had some speech problems, described as a tendency to "slur" his words and some trouble pronouncing words.

Gabriel was five years old by this time. His foster parent reported that he had adjusted well to the placement, that he loved to help around the house, and that he followed the daily routine very well. He tended to control the other children, telling them what to do and disciplining his younger half brother. Gabriel was struggling to keep up in kindergarten but the school's principal believed that Gabriel might not need special education; since he was a young kindergartener he might catch up with another year of kindergarten. Gabriel was generally healthy and was on track as far as his height and weight were concerned. He had recently had some wheezing that was being treated with an inhaler. The report described Gabriel as "a green eyed, light brown haired little boy, who, when you see him, you just want to squeeze his cheeks. He is very friendly and energetic; he is helpful with his brothers during visits."

Neither child was in a stable placement. No prospective adoptive home had yet been identified. The Department recommended long-term foster care, noting: "Both of the children are very cute and people are drawn to them the first time they see them. This worker's assessment is that in the future it will likely be possible to place both children in an adoptive home and terminate parental rights. At this point, however, neither of the children are in concurrent homes and both of them are experiencing significant behavior problems. Neither of the children's placements are stable, and while the department is working on stable adoptive homes, this stage has not been reached yet. It is therefore this worker's recommendation that the children remain dependents of the court, and that the children, Roland and Gabriel . . . participate in a plan of long term foster care until a nurturing adoptive home is secured."

The Department filed two addenda to its first report. In the last of the two, the Department changed its recommendation "from one of long term foster care to a permanent plan of adoption and termination of parent's visitation." The report noted the benefits adoption would provide and stated that it would be "beneficial if the children could be placed together. The department would like an opportunity to be able to find such an adoptive home. [¶] Although it may not be easy to find adoptive parents that are capable of meeting all of the children's needs, it is not impossible. In fact, this worker was notified on 3/21/05 that there is a possible concurrent placement for the sibling group." Although in her first report the social worker felt that the boys' behavior should be addressed before seeking an adoptive placement, the social worker now felt that "it would be most beneficial to begin the adoption search now,

and not wait for the children's behavioral improvements. . . . It is this worker's assessment that such permanence could provide stability that initiate [*sic*] positive behavioral and emotional changes. It is for these reasons this worker believes that the plan of adoption is in the children's best interests. This worker will recommend a permanent plan of adoption, but will not recommend that the parents' parental rights be terminated until an adoptive home is secured." The social worker hoped that terminating mother's visitation would help improve the boys' behavior.

The court adopted the findings and orders recommended in the Department's final report, which included the finding "[b]y clear and convincing evidence" that termination of parental rights would not be detrimental to the children. The juvenile court also adopted the finding that Roland and Gabriel had a probability of adoption but were difficult to place because they were members of a sibling group and because Roland was then being evaluated for the presence of a diagnosed medical, physical, or mental handicap. The court identified adoption as the permanent placement goal and ordered the Department to make efforts to locate an appropriate adoptive family for a period not to exceed 180 days. Mother has timely appealed.

## II. *Discussion*

### A. *Appealability*

The juvenile court's order was made pursuant to subdivisions (b)(2) and (c)(3) of section 366.26 (the subdivision (c)(3) order). The Department contends that such an order is not appealable because it merely defers the selection of a permanent placement plan. According to the Department, until the juvenile court makes that selection, there is nothing to appeal. Mother contends that the order, like all postdispositional orders in dependency proceedings, is appealable. We begin our analysis by examining the order in its statutory context.

■ Under subdivision (b) of section 366.26, the juvenile court may do one of four things at the time of the section 366.26 hearing: (1) terminate parental rights and free the child for adoption, (2) identify adoption as the goal and order the Department to try, for no more than 180 days, to locate an appropriate adoptive home, (3) appoint a legal guardian, or (4) order that the child be placed in long-term foster care. (§ 366.26, subd. (b).) In order to select adoption as the permanent placement plan, the juvenile court must make the findings required by subdivision (c)(1). Under subdivision (c)(1), if the court finds by clear and convincing evidence that the child is likely to be adopted, it must terminate parental rights and order the child freed for adoption unless it finds a compelling reason for determining that termination

would be detrimental to the child due to one or more of the five listed circumstances. The fact that the child is not yet placed with a family prepared to adopt the child, "shall not constitute a basis for the court to conclude that it is not likely the child will be adopted." (§ 366.26, subd. (c)(1).)

When a child's circumstances make him or her particularly difficult to place for adoption, the court may select the option listed under subdivision (b)(2), which is to identify adoption as the goal and give the Department more time to find an appropriate adoptive home. In selecting this option, the juvenile court proceeds under subdivision (c)(3), which provides, "If the court finds that termination of parental rights would not be detrimental to the child pursuant to paragraph [(c)](1) and that the child has a probability for adoption but is difficult to place for adoption and there is no identified or available prospective adoptive parent, the court may identify adoption as the permanent placement goal and without terminating parental rights, order that efforts be made to locate an appropriate adoptive family for the child within a period not to exceed 180 days. . . . At the expiration of this period, another hearing shall be held and the court shall proceed pursuant to paragraph (1) or (3) of subdivision (b). . . ." A child is considered difficult to place for adoption only if the lack of a current placement is due to "the child's membership in a sibling group, or the presence of a diagnosed medical, physical, or mental handicap, or the child is the age of seven years or more." (§ 366.26, subd. (c)(3).)[3]

The Department notes that there is a disagreement among the appellate courts about whether a subdivision (c)(3) order is directly appealable. *In re*

---

[3] Section 366.26, subdivision (c)(3) provides in full: "If the court finds that termination of parental rights would not be detrimental to the child pursuant to paragraph (1) and that the child has a probability for adoption but is difficult to place for adoption and there is no identified or available prospective adoptive parent, the court may identify adoption as the permanent placement goal and without terminating parental rights, order that efforts be made to locate an appropriate adoptive family for the child within a period not to exceed 180 days. During this 180-day period, the public agency responsible for seeking adoptive parents for each child shall, to the extent possible, ask each child who is 10 years of age or older who is placed in a group home for six months or longer from the date the child entered foster care, to identify any individuals, other than the child's siblings, who are important to the child, in order to identify potential adoptive parents. The public agency may ask any other child to provide that information, as appropriate. During the 180-day period, the public agency shall, to the extent possible, contact other private and public adoption agencies regarding the availability of the child for adoption. During the 180-day period, the public agency shall conduct the search for adoptive parents in the same manner as prescribed for children in Sections 8708 and 8709 of the Family Code. At the expiration of this period, another hearing shall be held and the court shall proceed pursuant to paragraph (1) or (3) of subdivision (b). For purposes of this section, a child may only be found to be difficult to place for adoption if there is no identified or available prospective adoptive parent for the child because of the child's membership in a sibling group, or the presence of a diagnosed medical, physical, or mental handicap, or the child is the age of seven years or more."

*Edward H.* (1996) 43 Cal.App.4th 584, 590 [50 Cal.Rptr.2d 745], held that such an order is appealable. *Edward H.* relied upon the general rule in dependency cases that all postdispositional orders are directly appealable. Another court rejected two appeals in which the parents challenged the juvenile court's finding that the children were probably adoptable. In both of these cases the appellate court took the position that the parents' appeal was premature because the juvenile court had not yet made a final determination of adoptability. (*In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1019 [128 Cal.Rptr.2d 654] (*Jacob S.*); *In re Cody C.* (2004) 121 Cal.App.4th 1297, 1301 [17 Cal.Rptr.3d 928] (*Cody C.*).) *Jacob S.* held that the parent's contention that the child was not adoptable was not ripe for review. (*Jacob S., supra*, 104 Cal.App.4th at p. 1019.) *Cody C.* went a step further and criticized *Edward H.* for failing to address the Department's assertion that "any findings made at the first of a two-phase section 366.26 hearing are necessarily interlocutory, as there is only one ultimate determination to be made, i.e., selecting a proper permanent plan." (*Cody C., supra*, 121 Cal.App.4th at p. 1301.)

The rationale of *Jacob S.* and *Cody C.* is that the probability-of-adoption finding is a purely interim conclusion. If an adoptive home is found within the time allowed, the issue of adoptability will be considered and decided at the further hearing. (§ 366.26, subd. (c)(1).) If no adoptive home is found, parental rights will not be terminated and the adoptability issue would be moot. In either case, reversal of the first order would be an idle gesture because it would merely return the matter to the status it held at the time of the first section 366.26 hearing—precisely the same thing that would have happened at the expiration of the extra time allowed by the subdivision (c)(3) order.

■ To the extent *Cody C.* or *Jacob S.* may be read as holding that a subdivision (c)(3) order is categorically unappealable, we respectfully disagree for two reasons. First, the general rule in juvenile dependency cases is that all orders (except for an order setting a section 366.26 hearing), starting chronologically with the dispositional order, are appealable *without limitation*. (*In re Natasha A.* (1996) 42 Cal.App.4th 28, 34 [49 Cal.Rptr.2d 332]; *Wanda B. v. Superior Court* (1996) 41 Cal.App.4th 1391, 1395 [49 Cal.Rptr.2d 175]; *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1150 [65 Cal.Rptr.2d 913]; *In re Daniel K.* (1998) 61 Cal.App.4th 661, 668 [71 Cal.Rptr.2d 764].) This is a well-established principle to which this court has consistently adhered. Both *Jacob S.* and *Cody C.* were concerned only with a parent's contention that there was insufficient evidence that the child was probably adoptable. Even assuming this contention was not reviewable because it concerned an interim finding, it is important to recall that one does not appeal from a finding; one appeals from a judgment or from an order that the Legislature has designated as appealable. (§ 395; Code Civ. Proc.,

§ 904.1; *Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, 1154 [11 Cal.Rptr.3d 129].) The juvenile court must make at least three findings before it may defer selection of a permanent placement plan under subdivision (c)(3). In addition to finding the child has a probability of adoption, the court must also find that termination would not be detrimental to the child and that the child is difficult to adopt for specified reasons. (§ 366.26, subd. (c)(3).) Given the variety of circumstances under which a court might make a subdivision (c)(3) order, we would not go so far as to say that all these findings are *necessarily* preliminary so that the order would never be appealable.

Second, given recent changes in the law, none of the juvenile court's findings may be considered truly preliminary. (*In re Ramone R.* (2005) 132 Cal.App.4th 1339, 1349–1350 [34 Cal.Rptr.3d 344] (*Ramone R.*).) Prior to 2003, subdivision (c)(3) provided that following the expiration of the extra time allowed for seeking an adoptive placement, "another hearing shall be held and the court shall proceed pursuant to paragraph (1), (3), or (4) of subdivision (b). . . ." (Stats. 2001, ch. 747, § 3.) This meant that at the further hearing the juvenile court could select adoption, legal guardianship, or long-term foster care, which, arguably, made the further hearing like a continuance of the section 366.26 hearing. Now, however, the Legislature has eliminated the option of long-term foster care when no adoptive placement is found. The court must "proceed pursuant to paragraph (1) or (3) of subdivision (b) . . . ." (§ 366.26, subd. (c)(3).) That is, at the expiration of the 180-day period, the court is limited to the choices of adoption and legal guardianship. It follows that reversal of an erroneous subdivision (c)(3) ruling would not be an idle gesture because it would have the effect of returning the parties to the initial permanency planning stage and permit the selection of long-term foster care as the permanent placement plan, a situation that could not be achieved by allowing the matter to proceed along the course directed by the current version of subdivision (c)(3).

The Department argues that this change in the law must have been inadvertent because it would result in encouraging the selection of long-term foster care at the initial hearing, a result the Department argues is at odds with the overall juvenile dependency scheme. According to the Department, the amendment is also meaningless for practical purposes because, if no adoptive home is found and there is no one willing to serve as legal guardian, the children will have to remain in foster care. The Department urges us to simply ignore this change in the law.

Although eliminating a placement option from the juvenile court's consideration may seem illogical, we must recall that in construing a statute, "that which is construed is the statutory text." (*City of Sacramento v. Public*

*Employees' Retirement System* (1994) 22 Cal.App.4th 786, 793 [27 Cal.Rptr.2d 545].) Evidence of legislative inadvertence would have to be quite compelling before we would ignore the plain language of the law. (*Silver v. Brown* (1966) 63 Cal.2d 841, 845 [48 Cal.Rptr. 609, 409 P.2d 689].) The only evidence of inadvertence the Department offers is its assessment of the unintended consequences the change will have. Legislation often has unintended consequences. But we cannot construe the amendment in a manner wholly unsupported by its text merely to avoid the purported unintended consequences. (*City of Sacramento v. Public Employees' Retirement System, supra,* 22 Cal.App.4th at p. 799.)

Furthermore, it appears from our research that the change might have been intentional. It does not seem to have been a clerical error. In 2003, the Legislature amended the pertinent portion of subdivision (c)(3) to read: "the court shall proceed pursuant to paragraph (1), (3), or of subdivision (b) [*sic*]." (Stats. 2003, ch. 813, § 7.) This was certainly a drafting error. But the Legislature corrected the error the following year, changing the pertinent language to "paragraph (1) or (3) of subdivision (b)." (Stats. 2004, ch. 810, § 5; see Historical and Statutory Notes, 73 West's Ann. Welf. & Inst. Code (2005 supp.) foll. § 366.26, pp. 214–215.) That is, the Legislature undertook to correct what was unquestionably a drafting error and revised the subdivision to read as it does today. This suggests to us that the Legislature probably meant what it said when it made the correction.

■ In addition, recent legislative activity has focused upon the goal of minimizing "long-term foster care" as a permanent placement plan, as opposed to the use of foster care as a temporary placement arrangement. The stated purpose of the 2003 revisions to California's juvenile dependency law was "to further the goal of achieving permanency for older children in foster care, *reducing reliance on long-term foster care* as a placement option for these children." (Assem. Com. on Human Services, Analysis of Assem. Bill No. 408 (2003–2004 Reg. Sess.) Apr. 29, 2003, p. 3, italics added.)[4] In 2004, the California Rules of Court, rule 1463 was amended to delete, "long-term" from the phrase "long-term foster care" as used in the connection with the juvenile court's placement orders. (Cal. Rules of Court, rule 1463(e)(6).) And federal law no longer refers to long-term foster care as an appropriate permanency plan but now speaks of a "planned permanent living arrangement." (42 U.S.C. § 675(5)(C).) In short, whatever the Legislature's precise purpose may have been, it is certainly true that both state and federal lawmakers have recently been concerned with the subject of long-term foster care. Thus, we cannot say that the elimination of long-term foster care from the options available following the 180-day period granted pursuant to

---

[4] On our own motion, we have taken judicial notice of the cited document pertaining to Assembly Bill No. 408, which is contained in the files of the Legislative Counsel.

subdivision (c)(3) was so clearly inadvertent that we are at liberty to ignore it. If, indeed, the change was not intended we call upon the Legislature to correct it. For now, we must accept the law as written. Thus, we agree with *Ramone R.* that the subdivision (c)(3) order must be appealable, and the court's findings must be promptly reviewable, in order to preserve long-term foster care as a placement choice in cases where the court has made the subdivision (c)(3) order without the evidence necessary to support it. (*Ramone R.*, *supra*, 132 Cal.App.4th at p. 1351.)

## B. *Sufficiency of the Evidence*

We now turn to the merits of mother's contentions. Mother argues that the evidence is insufficient to support the finding that the children were probably adoptable or that they were difficult to place because they were members of a sibling group or because of a diagnosed mental, physical, or medical condition. We review the order under the substantial evidence standard of review. (*In re Erik P.* (2002) 104 Cal.App.4th 395, 400 [127 Cal.Rptr.2d 922].)

It is true that there is no evidence that either child had a diagnosed condition that made him difficult to place for adoption. That deficiency is immaterial, however, because there was another reason they were difficult to place and that is their membership in a sibling group. Mother's contention that they were not a sibling group is simply wrong. It is true that they fought with each other, but the social worker felt that placement together would be in their best interest. They were full brothers. They had been raised together until they were removed from mother's custody when the youngest was two years old. The recommended permanent plan is adoption of both boys together. That plan makes the children difficult to place within the meaning of subdivision (c)(3).

Mother's contention that there was insufficient evidence that the children had the probability of adoption is equally unavailing. In determining whether a child is likely to be adopted, the juvenile court must focus on the child and whether the child's age, physical condition, and emotional state may make it difficult to find an adoptive family. (*In re Erik P.*, *supra*, 104 Cal.App.4th at p. 400.) Under subdivision (c)(3), the court merely needs to find that, under the circumstances, the children have a probability of adoption. Although mother points to the problems that make the children difficult to place, there is other evidence to support the finding that adoption is probable. They are young children—only three and five years of age. Both are healthy, developmentally on target in most areas, and they are physically appealing. Although their behavioral problems could make placement difficult, the social worker believed that a stable adoptive home might be the way to address those problems. This is sufficient, in our view, to support a finding that Roland and Gabriel had the probability of adoption.

III. *Disposition*

The judgment is affirmed.

Elia, J., and Bamattre-Manoukian, J., concurred.

A petition for a rehearing was denied January 10, 2006, and appellant's petition for review by the Supreme Court was denied March 15, 2006, S140651. George, C. J., did not participate therein.