Filed 6/21/16  In re Dixie M. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re DIXIE M., a Person Coming Under the Juvenile Court Law. | B266501 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>THEODORE M.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK95335) |

APPEAL from an order of the Superior Court of Los Angeles County, Annabelle Cortez, Judge.  Affirmed.

Pamela Rae Tripp for Defendant and Appellant.

Mary C. Wickham, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

———————————————

## INTRODUCTION

Theodore M., maternal grandfather of Dixie M., appeals from the order of the juvenile court denying his petition for modification seeking to have the child placed with him. (Welf. & Inst. Code, §§ 388 & 361.3.)[1] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Dixie's dependency*

The Department of Children and Family Services (the Department) removed Dixie from her mother in November 2012 when Dixie was 15 days old, and placed her with Mr. and Mrs. G., where she has been ever since. Throughout the dependency, Dixie's mother was difficult to locate and had almost no contact with the Department.[2] When Dixie was detained, mother named maternal cousin, M.M., as a possible relative placement for the baby. Mother did not mention her own father, Theodore.

At some point, the Department learned of Theodore's existence. On February 20, 2013, Theodore informed the dependency investigator that he would like Dixie to be released to his care. At the time, the Department was in the midst of genetically testing the father of Dixie's older sister who be given custody if he were proven to be Dixie's father. The test results were negative and so on May 31, 2013, the investigator confirmed that Theodore remained interested in having Dixie live with him and his adult daughter, Winter M., in Holyoke, Minnesota.

In June 2013, at the disposition hearing in Dixie's dependency, the juvenile court ordered the Department to initiate an Interstate Compact for the Placement of Children (ICPC) and a home study to determine whether to place Dixie with Theodore M. Theodore confirmed his receipt on September 26, 2013 of the ICPC packet from the Department.

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Mother's parental rights were eventually terminated by the juvenile court in this case and so mother is not a party to this appeal.

Finding that mother's whereabouts were unknown, the juvenile court denied her reunification services (§ 361.5, subd. (b)(1)) and set the selection and implementation hearing. (§ 366.26.) The court also asked the Department to address in its next report, among other things, the adoption assessment and the status of the ICPC.

The Carlton County Minnesota Health and Human Services Office (the Minnesota Agency) approved Theodore's ICPC in February 2014, 15 months after Dixie was removed from mother's custody. Meanwhile, Theodore had maintained monthly contact with the Department about the status of the ICPC and the child. He continued to want Dixie placed with him. Theodore indicated that Winter, who has a criminal history, did not reside in his home.

The Department recommended to the juvenile court in its status review report that Dixie not be released to Theodore. It had received several JV-285 Relative Information forms and telephone calls from the family of the maternal grandmother expressing "concern at the prospect of placing the child in the care of [Theodore]." Maternal Aunt Jodie S., maternal aunt Dena M., and maternal second cousin M.M., described how Theodore physically, emotionally, and sexually abused his wife, the now-deceased maternal grandmother, and girls in his care. These relatives reported that Theodore had physically abused mother when she was 15 years old causing her to be removed from his custody. Jodie S., who lived with Theodore from the age of seven, related that Winter and her boyfriend, who lived with Theodore, abused drugs and had extensive criminal histories. Jodie also reported that Theodore has a history of alcohol use, was convicted of driving under the influence, and that many family members were made to watch Theodore physically abuse the maternal grandmother. Jodie S. was "astonished that the [S]tate of Minnesota would issue a foster care license to [Theodore]." The Department recommended against moving Dixie to Minnesota. The foster family social worker opined that a move would be detrimental for the child, who was thriving in the care of G.s with whom she had lived for 16 months.

3

2. *Theodore's petition for modification* (*§ 388*)

At Dixie's July 30, 2014 selection and implementation hearing, the Department informed the juvenile court and parties that Theodore had retained attorney Weidt who planned to file a modification petition (§ 388) on Theodore's behalf. The Department maintained its view that Theodore was not a suitable caregiver for Dixie. The child's attorney agreed that placement of the child with Theodore was not safe and wanted to proceed with adoption by the G.s. The court continued the section 366.26 hearing.

Theodore's December 2014 section 388 petition sought custody of Dixie in Minnesota, to be supervised by the Minnesota Agency. As change of circumstance, Theodore stated that he had completed the required procedures to be licensed as a foster parent by the State of Minnesota. With respect to how the change in order would be in Dixie's best interest, Theodore stated he would prepare a response and submit it to the court within 10 days. In reply, the Department reiterated its concerns about placing the child with Theodore and restated its approval of the care that the G.s were providing the child, who had been with them since her infancy. The court ordered a hearing on the petition.[3]

In its interim review report filed immediately prior to the hearing on Theodore's section 388 petition, the Department related that when mother was 16 years old, Theodore hit her with his fist on the right side of her head near the temple. The maternal grandmother called child protective services and mother was removed from their care for about a year while Theodore completed court-ordered services. Mother's Minnesota

---

[3]     Theodore also asked that Dixie visit him in Minnesota under the supervision of the Minnesota Agency. Theodore represented that the Agency was willing to accept whatever conditions the court put on the visit. Dixie's attorney, joined by the Department, opposed the visitation request because the issue to be addressed at the hearing on Theodore's modification petition was not simply the child's placement with Theodore, but also whether she should have any contact with him. The court postponed the visitation issue until the hearing on the modification petition. The court observed that it was not in the child's best interest at that point to order visitation "based on the information the Court has thus far."

dependency file was destroyed. Mother stated, on the eve of Dixie's section 366.26 hearing, that she wanted Dixie released to Theodore and announced her plan to return to Minnesota. The Department also attached to its report the ICPC documents from Carlton County, Minnesota. There, in response to question No. three, "Have any of your own children been in foster care . . . ." Theodore had put: "[mother] as a teenager. Took off w/ her mother. Due to delinquent behavior." The Department noted Theodore's failure to mention that he struck mother in the head. Additionally, Theodore responded "no" to the question, "Has any individual living in your household . . . been involved in an incident of assault, child battering, child abuse, child molesting, or child neglect?" Also attached to the Department's interim review report were police reports indicating approximately 14 incidents between 2006 and 2013 in which Winter and her boyfriend, who lived in Theodore's house, stole guns, propane tanks, and a gas can from homes in the area, were arrested for disorderly conduct and possession of stolen property, and engaged in discord with neighbors.

At the hearing on Theodore's petition for modification, attorney Weidt withdrew from any further participation in the matter. The Department's social worker testified that mother never contacted her or provided her with any information about her family or otherwise until just before the hearing. The first time the social worker heard about the existence of a grandfather was when Theodore contacted her in 2013. She told him about the ICPC process. The two spoke approximately once a month after the ICPC was initiated. The social worker did not know how many messages he left her. Although the ICPC was approved, the Department did not place Dixie with Theodore because, as it reported to the juvenile court at the time, the maternal relatives' oral and written statements raised concerns. The social worker did not investigate the accusations. Theodore was told of the decision not to place Dixie with him. The social worker acknowledged that the relatives' statements were hearsay, yet none of the maternal relatives who provided statements asked to have Dixie placed with them. The reasons for the Department's recommendation against placing Dixie with Theodore were: the maternal relatives' statements; Dixie's growth with the G.s who were the only caretakers

5

the child had ever known; and mother had never contacted the social worker about placing the child with Theodore.

Brenda Carlson at the Minnesota Agency testified that, in connection with the ICPC process, she discovered Theodore's conviction for driving under the influence. Asked who else lived in his home to run a criminal background check, Theodore named Winter but omitted to mention Winter's boyfriend. Winter's criminal background check revealed a criminal history disqualifying her from living with Dixie or providing Dixie with care. Theodore promised that Winter would move out. Theodore told Carlson about his involvement with the Carlton County Children and Family Services who had "assist[ed] him with parenting information and therapy for his children," but because mother's case was more than 10 years old, the files had been expunged and so she was unable to investigate. Carlson was unaware that relatives accused Theodore of sexual molestation when she approved his foster care license. Carlson testified that she received the ICPC request in September 2013 and completed her portion of it in January 2014. She first learned about the accusations made by the maternal relatives was when she called the Department in April 2014 about the status of the ICPC.

In his testimony, Theodore described how he came to hit mother when she was a teenager. With respect to the relatives' statements, he claimed he had not spoken to those family members for over a decade.

The juvenile court denied Theodore's modification petition. The court found that Theodore failed to demonstrate changed circumstances and found that Dixie's best interest would not be served by removing her from the G.s. The court found that Theodore had not been "completely forthright about the information he provided during the [ICPC] approval process" and that his disclosure about mother's foster care history was "inaccurate." The court declined to make a finding about whether the family members' allegations of sexual abuse were true because much of it had not been verified. But, it could not ignore the concerns raised in the maternal relatives' reports. Certain of the relatives' allegations seemed more consistent with the evidence than did Theodore's testimony. The allegation that people with criminal histories would have access to Dixie

was borne out by Carlson's testimony about Winter's disqualifying criminal background. The court rejected Theodore's suggestion that the relatives had ulterior motives in making the allegations to the Department, noting that the relatives had no personal stake in the outcome of the section 388 petition as they were not competing to have Dixie be placed or visit with them. Meanwhile, the court found that Dixie was in a safe and loving home, where she had been for most of her life, and was fully integrated within the family with whom she had strong emotional ties. Theodore appealed.

## CONTENTS

Theodore contends that the order denying his petition for modification was error.

## DISCUSSION

Theodore's sole contention on appeal is that "Relative placement applies anytime dependent children need to be *replaced* and is the preferred out-of-home placement option for dependent children. Placement with a relative should occur unless evidence establishes that the relative placement would not be in the children's best interests." (Italics added.)

Section 361.3[4] establishes "preferential consideration" for relative placement (*id.*, subd. (a)); it does not operate as an evidentiary presumption in favor of placement with a

---

[4] Section 361.3, subdivision (a) reads in relevant part, "In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative . . . . In determining whether placement with a relative is appropriate, the county social worker and court shall consider, but shall not be limited to, consideration of all the following factors: [¶] (1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs. [¶] (2) The wishes of the parent, the relative, and child, if appropriate. [¶] . . . [¶] (4) Placement of siblings and half siblings in the same home, unless that placement is found to be contrary to the safety and well-being of any of the siblings . . . . [¶] (5) The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect. [¶] (6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful. [¶] (7) The ability of the relative to do the following: [¶] (A) Provide a safe, secure, and

7

relative.  (See *In re Stephanie M*. (1994) 7 Cal.4th 295, 320 [§ 361.3 in effect at time child removed from parent did not operate as evidentiary presumption].)  Nor does the statute guarantee placement with a requesting relative; it establishes preferential *consideration*.  The statute contains a non-exhaustive list of factors for the juvenile court to evaluate when deciding whether placement with a requesting relative is appropriate.

The first and paramount factor is "The best interest of the child."  (§ 361.3, subd. (a)(1).)  The record supports the juvenile court's finding that it was not in Dixie's best interest to move her and hence not in her best interest to be placed with Theodore.  The maternal relatives' allegations of Theodore's sexual and physical abuse of female family members are disturbing.  While the relatives' allegations were unverified hearsay, the juvenile court considered some of the accusations that it found to be more consistent with the record than the information that Theodore provided.  For example, the allegations that

---

stable environment for the child.  [¶]  (B) Exercise proper and effective care and control of the child.  [¶]  (C) Provide a home and the necessities of life for the child.  [¶] (D) Protect the child from his or her parents.  [¶]  (E) Facilitate court-ordered reunification efforts with the parents.  [¶]  (F) Facilitate visitation with the child's other relatives.  [¶]  (G) Facilitate implementation of all elements of the case plan.  [¶] (H) Provide legal permanence for the child if reunification fails.  However, any finding made with respect to the factor considered pursuant to this subparagraph and pursuant to subparagraph (G) shall not be the sole basis for precluding preferential placement with a relative.  [¶]  (I) Arrange for appropriate and safe child care, as necessary.  [¶]  (8) The safety of the relative's home . . . .  [¶]  . . . The court shall order the parent to disclose to the county social worker the names, residences, and any other known identifying information of any maternal or paternal relatives of the child.  *This inquiry shall not be construed, however, to guarantee that the child will be placed with any person so identified*.  The county social worker shall initially contact the relatives given preferential consideration for placement to determine if they desire the child to be placed with them. Those desiring placement shall be assessed according to the factors enumerated in this subdivision.  The county social worker shall document these efforts in the social study . . . .  The court shall authorize the county social worker, while assessing these relatives for the possibility of placement, to disclose to the relative, as appropriate, the fact that the child is in custody, the alleged reasons for the custody, and the projected likely date for the child's return home or placement for adoption or legal guardianship. However, this investigation shall not be construed as good cause for continuance of the dispositional hearing conducted pursuant to Section 358."

8

Winter and her boyfriend had criminal records and that mother had been removed from Theodore's custody when she was a teenager because of Theodore's physical abuse were substantiated. The court did not doubt the motives of these maternal relatives in volunteering the information because they were not requesting visitation with, or custody of, Dixie. The court found that during the ICPC process Theodore was *not fully forthcoming* and disclosed *inaccurate information* concerning his involvement in mother's dependency and his prior conviction for driving under the influence. The record shows that placing Dixie with Theodore would not be in the child's best interest. (§ 361.3, subd. (a)(1).)

The second section 361.3 factor is "The wishes of the parent, the relative, and child, if appropriate." (*Id.*, subd. (a)(2).) At the time of Dixie's removal, mother identified M.M., *not Theodore*, as a relative to consider for placement. (*Ibid.*) M.M. did not request custody of Dixie. Mother did not indicate a wish to place Dixie with Theodore until late April 2015 after which mother announced her intention to move to Minnesota. Mother's request was made 30 months into Dixie's dependency and just days before the scheduled selection and implementation hearing. The juvenile court would be justified in concluding that mother only requested placement of the child with Theodore so that she could have a relationship with the child after she lost her parental rights. The fifth factor is "The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or *has been responsible for acts of child abuse or neglect*." (*Id.*, subd. (a)(5), italics added.) The juvenile court's determinations above justify a finding against Theodore on this factor.[5] In short, the record shows that the juvenile court considered the factors in section 361.3, subdivision (a) and the evidence supports its finding they militate against placing Dixie with Theodore.

---

[5] Dixie has no relationship whatsoever with Theodore. (§ 361.3, subd. (a)(6).) The record indicates that Theodore would be unable to provide Dixie a safe, secure, and stable environment given the presence of Winter and her boyfriend. (*Id.*, subd. (a)(7) & (8).)

The order appealed from is the one denying Theodore's petition seeking a modification of the order placing Dixie with the G.s. Under section 388, Theodore had the burden to show, by a preponderance of the evidence, a genuine change of circumstances or new evidence showing that placing Dixie with him was in the child's best interest. (§ 388; *In re Ramone R*. (2005) 132 Cal.App.4th 1339, 1348; *In re Casey D*. (1999) 70 Cal.App.4th 38, 47.) The petition is addressed to the court's sound discretion and on appeal, the decision will be disturbed only when there is a clear abuse of that discretion. (*In re Stephanie M*., *supra*, 7 Cal.4th at p. 318.) Regardless of whether Theodore demonstrated a change in circumstances, as explained, he failed to show it would be in Dixie's best interest to be removed to Theodore's custody. Hence, Theodore failed to carry his burden.

Theodore's appellate brief goes to great lengths to blame the result here on the Department's failure to evaluate him sooner. He argues that the Department then failed to notify him of his rights and the steps to take under the ICPC procedure, and then stymied the process by avoiding his telephone calls, failing to notify him of hearings and to set up visitation, and even delaying in notifying the juvenile court of his existence, which delays only allowed Dixie more time to bond with the G.s. (*In re R.T*. (2015) 232 Cal.App.4th 1284.) The contention is misplaced. As is clear from the record, mother -- who was impossible to locate and who rarely communicated with the Department -- *did not name Theodore until just before the hearing on this section 388 petition*. At the time the child was removed, mother named M.M. as a potential relative caretaker. Although the Department should have commenced the process sooner and acted more quickly upon learning of Theodore's wish to take custody of Dixie, and although by the time the court made its ruling Dixie had bonded with the G.s, on this record, Theodore would not have qualified under section 361.3 for placement, regardless of how early in this dependency the Department made its assessment of him.

## DISPOSITION

The order appealed from is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



ALDRICH, J.



We concur:



EDMON, P. J.



LAVIN, J.

11