Filed 12/23/14  K.B. v. Super. Ct. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

<table>
<tr><td>K.B.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN MATEO COUNTY,<br><br>    Respondent;<br><br>SAN MATEO COUNTY HUMAN SERVICES AGENCY,<br><br>    Real Party in Interest.</td><td>A143110<br><br>(San Mateo County<br>Super. Ct. No. 81608, 81612, 81613)</td></tr>
</table>

Petitioner K.B. (mother) petitions this court for extraordinary writ review of juvenile court orders setting a selection-and-implementation hearing under Welfare and Institutions Code section 366.26[1] for her two sons, 13-year-old L.L.B. and 10-year-old L.A. (the brothers), and her daughter, 6-year-old J.W.  She argues that the juvenile court improperly applied a statutory presumption and lacked substantial evidence to find that the brothers would suffer a substantial risk of detriment if returned to her care.[2]  We disagree and deny the petition.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

[2] Mother does not argue that the juvenile court erred in making any findings as to J.W., and we therefore do not discuss facts pertaining to J.W. except as relevant.

1

I.

FACTUAL AND PROCEDURAL
BACKGROUND

A.      *July to November 2011:  Mother Has Difficulty Caring for Her Four*
        *Children After a Fifth Child Dies.*

In July 2011, 12-year-old L.B. (L.L.B.'s sister and L.A. and J.W.'s half sister) died after overdosing on methadone mother was prescribed to treat her chronic pain. Real party in interest San Mateo County Human Services Agency (Agency) filed petitions seeking dependency court jurisdiction over the four other children under mother's care:  L.L.B., L.A., J.W.,[3] and P.F., another half sister.[4]  Jurisdiction was alleged under section 300, subdivision (b) (failure to protect) and subdivision (j) (abuse of sibling) on the bases that mother (1) had "mental health issues" and had left controlled substances where the children could reach them; (2) had failed to seek mental health treatment for L.B. even though L.B. had been cutting herself for several months before her death; and (3) had improperly cared for P.F., who had attempted suicide the previous year by taking mother's sleeping pills.  None of the four children was removed, however, and they remained in mother's care.

At the detention hearing, counseling was ordered for mother and the children. Although she insisted that the family needed counseling to address L.B.'s death, mother failed to return therapists' telephone calls, sign the necessary releases, or otherwise secure counseling services.  P.F. and the brothers eventually began to be assessed for counseling, but it was still "a slow process, mainly due to . . . mother not calling back service providers to set appointments or failing to show up for appointments."

---

[3] L.L.B., L.A., and J.W. all have different fathers, none of whom had custody at the time the children were detained and none of whom has sought relief from the juvenile court's order.  As a result, we do not discuss facts pertaining to the children's fathers except as relevant.

[4] The orders at issue do not include P.F., and the current status of her dependency case is unclear from the record before us.  We do not discuss facts pertaining to her except as relevant.

Mother reported that from 2004 to 2008 she was in a relationship with J.W.'s father that was marked by " 'a lot' of domestic violence" and her reliance on methamphetamine and alcohol. Several child-welfare referrals involving the family were made throughout those and following years. Mother stated that she had completed a drug treatment program in 2009, relapsed in February 2010 after P.F. overdosed on sleeping pills, and stopped using drugs again in November 2010. Several months later, mother admitted that she had relapsed after L.B.'s death and "began shooting methamphetamine and heroin two to three times a day" and drinking "approximately one bottle of wine a day."

Mother also has had a history of mental health issues. She has suffered from depression, particularly during her relationship with J.W.'s father. She reported that at some point during that relationship, she " 'had a nervous breakdown' " and was " 'so depressed that [she] couldn't function' " so that " '[t]he kids had to help [her]. . . . It was like [six] months of doing nothing' " during which she " 'wanted to die.' " Around August 2010, she was diagnosed with bipolar disorder during an initial mental health assessment, but she failed to follow through with treatment.

The jurisdiction/disposition hearing was set for late August 2011, but it was continued after mother was hospitalized for psychiatric issues when she overdosed on one of her medications and said " 'she wanted to go to sleep and never wake up.' " She later told the social worker she was hospitalized because she felt " 'overwhelmed.' " A therapist who treated mother after her hospitalization reported that mother's mental health had "stabilized," but mother still failed to follow through to obtain counseling for herself and her children. Mother also confessed to cutting herself in September 2011 "because it made her 'feel better,' " although she denied suicidal thoughts. Agency reports filed in the months after L.B.'s death noted that the maternal grandfather—who, it was later learned, was using heroin, often with mother, during this period—and his partner were providing most of the children's care. When social workers visited the home, mother often seemed overcome with grief and unable to cope.

In late September and early November 2011, the juvenile court adjudged the four children to be dependents after finding them children described by section 300, subdivisions (b) and (j). Court-ordered family maintenance services required the family to receive grief counseling and required mother to participate in a substance-abuse outpatient program, be drug tested, and be evaluated for mental health issues. The children remained in mother's care.

B. *November 2011 to March 2013: Mother Is Incarcerated.*

In mid-November, mother was arrested on numerous felony charges—including burglary, identity theft, heroin possession, and possession of drug paraphernalia—and jailed. She was on probation at the time. The Agency filed supplemental petitions under section 387 for a more restrictive placement for the four children, and they were removed. The brothers were placed together in a foster care home, where they have remained throughout this case. P.F. and J.W. were placed together in a different foster home, but they were soon separated and have both had many subsequent placements.

While in jail, mother completed several programs and classes, including a parenting program and a substance abuse program. She also received counseling to address the "trauma and grief" she felt after L.B.'s death and learned, in her words, that "I needed to accept what had happened. I needed to move forward and not stay stuck, . . . for myself and for my children. I needed to learn ways to deal with that grief without drugs."

In January 2012, the brothers began weekly visits with mother at the jail. Although their foster mother reported that afterward they were "routinely more physical with each other and . . . [got] into more arguments and fights with one another," the social worker concluded that mother was "making progress and working hard in her supervised visitation program with" them.

In May 2012, after the jurisdiction/disposition hearing on the supplemental petitions had been continued several times, the juvenile court found that the previous disposition had not been effective. The updated case plan required mother to (1) obtain

4

substance abuse treatment and drug test weekly; (2) obtain counseling for herself; and (3) complete a parenting education program.

The following month, mother was transferred to state prison with release scheduled for March 2013. Although prison regulations did not permit visitation between her and the children for the first three months, visitation resumed on a monthly basis in November. While in prison, mother completed a substance abuse program. She later testified that she also participated in individual therapy in which she and her therapist "addressed everything. Me losing my daughter. The way that I grieve. The way that I got arrested. Childhood issues. The fact that my mom was in prison. Being molested. Everything."

The report prepared before the January 2013 12-month status-review hearing recommended that mother continue to receive services because she "ha[d] made steady progress with all possible services while incarcerated" and "ha[d] demonstrated that there [was] a likelihood that she [would] be able to reunify with the children within the statutory timeframe allotted to incarcerated parents." At the hearing, the juvenile court found there was a substantial probability that the children would be returned to mother at the 18-month status-review hearing.

C.    *March to September 2013: Mother's Reunification Efforts Are Inconsistent.*

Mother was released from prison on March 11, 2013. The May 2013 18-month status-review report stated that the children were "in the process of beginning dyad therapy with . . . mother," as called for in the updated case plan. In addition, mother was referred to individual counseling, an outpatient drug program, and parenting classes. The report expressed concerns about mother's ongoing use of prescribed methadone, which she tested positive for in March and April, and concluded that "further stability must be demonstrated prior to reunifying with her children." The Agency continued to recommend, however, that mother receive services.

Mother stopped using methadone by May, but between late July and early September she missed six drug tests, which were considered "administratively dirty." By

5

September, she still had not "officially enrolled in an [o]utpatient program," although she told the social worker that she was attending Narcotics Anonymous meetings and eventually submitted logs showing her attendance from October through the following April.

In the first few months after her release, mother attended some therapy sessions with P.F. and J.W., but her attendance was irregular. The brothers' therapist "ha[d] been unable to coordinate a time with . . . mother to begin family therapy despite several attempts to reach her by telephone." A September 2013 addendum report stated that visits between the brothers and mother were going well but that mother had been inconsistent in visiting J.W. and participating in dyad therapy with her. The Agency continued to recommend that mother receive services.

D. *September 2013 to March 2014: Mother Relapses and Stops Complying with the Case Plan.*

On September 9, 2013, mother, who knew she was pregnant, tested positive for methamphetamine. She later claimed that she used drugs for only a few days after this relapse, but she continued to miss drug tests and stopped testing for the Agency by November. Mother requested a referral for inpatient drug treatment, but she did not follow through with the program.

Mother had an unstable living situation and was moving among locations in the South Bay. She was not attending dyad therapy with the brothers or J.W., and she was not visiting with the brothers at their foster home in the East Bay, even though the Agency arranged for transportation. L.A. told his foster mother that "mother now had a boyfriend and no longer cared about him and [L.L.B.]" Mother also "declined treatment" when the social worker referred her to individual therapy. Mother "indicated . . . that she was tired as a result of all the requirements of her case plan" and "it was difficult for her to travel to several locations to participate in these services." She later testified that she felt "overwhelmed" during this period. She was also discouraged because she believed the current social worker did not acknowledge the positive efforts she had made, particularly while in prison, to reunify with the children.

6

A January 2014 status-review report expressed the concern "that [mother] would not be able to handle the various, demanding needs of her children if [they] returned to her care." While "[t]he fact that . . . mother made progress while in prison [was] not something that ha[d] gone unrecognized[,] . . . mother was in a contained and extremely structured environment with no access to drugs or alcohol. The ability to demonstrate this progress outside of the restrictive environment was the necessary component to determine . . . mother's capability to care for these four children. Although she was able to demonstrate progress initially upon her release, [she] was unable to maintain it over time when the structure was removed." The report concluded that mother "ha[d] steadily declined in her participation with Court-ordered services" and had "made no progress" since September. For the first time, the Agency recommended terminating mother's reunification services, but the 18-month status-review hearing was continued again and the juvenile court made no new rulings.

E.   *March to September 2014: Mother Renews Her Efforts to Reunify.*

Mother, who was now less than two months away from giving birth, completed postrelease community supervision in March 2014. She had reported her positive test for methamphetamine to her probation officer but had otherwise tested clean once per month for him. She resumed consistent drug testing for the Agency in March, and her test results were clean aside from the presence of various prescription medications. She also resumed visits with the brothers. She attended two dyad therapy sessions with them in March, but their therapist left her employment, and there were no further appointments scheduled before the hearing at issue.

Also in March, mother was threatened with a knife by her unborn child's father, with whom she had been in a relationship since 2010. She obtained a restraining order against him and moved into a shelter, and he was ultimately incarcerated. While at the shelter, she took parenting classes and received domestic-violence counseling. Although she did not engage in individual therapy, she later testified, "I learned a lot of things about myself" there, including that "when I get overwhelmed, . . . if I feel like I'm being defeated or nothing is being acknowledged, . . . I will shut down, and I will feel

7

discouraged. [¶] But I know that even if I feel like that, I have to do the opposite, and . . . I don't shut down or isolate myself any[]more[.]"

In early May 2014, mother gave birth to a "medically fragil[e]" baby girl, A.B., and stayed in the hospital to care for her until she was released a couple months later. By mid-August, mother was living in transitional housing with A.B., attending an outpatient substance abuse program and remaining clean and sober, and attempting to secure more permanent housing. After A.B.'s birth, mother also began regularly attending individual therapy, which she testified she had resisted in the past because of her experiences with therapy while she herself was a foster child. The social worker testified that mother "appear[ed] to be very appropriate and attentive to [A.B.]'s needs" and there was no concern that A.B., who required ongoing medical care, was at risk.

### F. *The Juvenile Court Finds that the Children Would Face a Substantial Risk of Detriment if Returned to Mother's Care.*

The contested 18-month status-review hearing giving rise to the petition at issue was held over several days in July, August, and September 2014.[5] Much of the evidence presented related to the extent to which mother had complied with the case plan. The hearing was also focused on J.W., who had made suicidal statements and had exhibited "aggressive behaviors, sexualized behaviors," excessive crying, and enuresis. J.W.'s therapist testified at length about J.W., whom she characterized as "very emotionally fragile," and the effects of mother's actions on her.

The brothers both testified that they wished to return to mother, although L.L.B. also testified that he loved being at their foster home. The brothers' attorney stated that she wished mother could continue to receive services but recognized that the only options were to terminate services or return the boys to mother's custody. She said,

---

[5] Although it is unclear whether the eventual hearing was considered an 18-month status-review hearing or, since it was continued so many times, a combined 18-month/24-month status-review hearing, the uncertainty does not affect our disposition. The same standard for returning a child to a parent's custody applies at both junctures. (§§ 366.22, subd. (a), 366.25, subd. (a)(1).)

8

In thinking creatively and talking to county counsel and the social worker, I have decided to advocate to continue giving . . . mother more of a chance by submitting on the [Agency]'s recommendation. This way, the boys would remain [in their foster home] for now and it would be called long-term foster care [or] guardianship, but . . . mother could potentially start having longer visits with the kids, including overnight and weekends, which the Agency is open to, while . . . developing her stability.

. . .

I absolutely do not want adoption and termination of parental rights as to the boys in this case. The boys need their mother. It is my understanding after talking with county counsel that under this plan, . . . mother's parental rights cannot be terminated because [L.L.B.] is a 12-year-old who has veto capacity as to adoption. And that [the brothers] have to be kept together by statute. This way, whether we end up with long-term foster care or guardianship, when [mother] develops stability she can still file a motion for the return of the boys.

After hearing arguments from the various parties, the juvenile court found that "the evidence is clear in this record that mother has failed to participate regularly and make substantive progress in court-ordered treatment programs," which was "prima facie evidence that return would be detrimental." (§§ 366.22, subd. (a), 366.25, subd. (a)(1).) It observed that mother "did participate in services" in jail and prison but that after being released, "notwithstanding that the children were still in foster homes, mother relapsed. And mother continued . . . to see the man [whom] she had been seeing in 2010. She continued to see him through 2014, and had a baby with him, and there was domestic violence . . . . [¶] So whatever mother learned from her services in prison did not, unfortunately, follow through into her actions . . . thereafter." The court "commend[ed]" mother, however, for "her recent efforts" and said it appeared she was "doing all that she can."

Having determined that the statutory presumption was established, the juvenile court continued:

So the question becomes [whether] . . . the evidence that has been presented by mother . . . rebuts the prima facie evidence; and as noted by [J.W.'s attorney], it does not.

9

Mother's efforts have been very recent . . . when one looks at the timeline before the Court.

And so the Court has considered the extent to which mother has availed herself of the services provided. And recently, it appears to the [C]ourt that she has been consistent. She has a special-needs child . . . who[m] she is caring for . . . and who[m] she loves.

And the Court has concerns about mother's ability, based on the history of this case, to take care of three additional children . . . .

Mother has failed to regularly test. She has failed to regularly participate in therapy and she has failed to regularly visit her children. She was involved in domestic violence . . . and had continued to test positive for opiate substances.

Her housing situation is and was precarious; however, it is more stable now . . . . But based on the totality of circumstances, the Court finds . . . by [a] preponderance of the evidence . . . that the [Agency] has demonstrated that return of the children would create a substantial risk of detriment to [their] safety, protection[,] or physical or emotional well-being . . . .

And that failure of mother to participate regularly and make substantive progress in court-ordered treatment programs, as the Court has noted as prima facie evidence, that return would be detrimental and that has not been rebutted by mother's case.

. . . [T]his has not been an easy case. Because of mother's recent efforts, there's no question that mother loves her children, but mother has been resistant to therapy and it has come out why, but that doesn't make it any better. Her children and she need to be in therapy with [each other] to get through this together and mother has been resistant and she has had her reasons, which the Court respects.

But mother has not put her children . . . first during the pendency of this case.

The juvenile court terminated mother's reunification services and scheduled a selection-and-implementation hearing for the brothers and J.W.[6] It ordered unlimited, unsupervised visitation between mother and the brothers but gave the Agency "discretion to return to supervised visitation [with] mother if she tests positive for drug or alcohol use or poses a danger to the[ir] safety."

II.

DISCUSSION

A. *The Juvenile Court Properly Applied a Statutory Presumption in Finding that the Brothers Would Face a Substantial Risk of Detriment if Returned to Mother's Care.*

Mother claims that the juvenile court erred by relying on a statutory presumption about a parent's failure to participate in court-ordered services in concluding that the brothers would face a substantial risk of detriment if returned to her care. (§§ 366.22, subd. (a), 366.25, subd. (a)(1).) We disagree.

"Until services are terminated, reunification is the goal" and there is a " ' "strong preference for maintaining the family relationships if at all possible." ' " (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 788.) Consequently, at an 18- or 24-month review hearing, "the [juvenile] court shall order the return of the child to the physical custody of his or her parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§§ 366.22, subd. (a), 366.25, subd. (a)(1).)

When a social services agency has presented evidence that a parent has failed to participate in the case plan, a presumption arises that return would pose a substantial risk of detriment: a parent's "failure . . . to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§§ 366.22, subd. (a), 366.25, subd. (a)(1).) Once the agency has proven such a failure, the burden of producing evidence to the contrary shifts to the

_____

[6] The selection-and-implementation hearing was originally scheduled for December 11, 2014, but we are informed that it has been continued to January 5, 2015.

11

parent and, if the parent does not carry that burden, the juvenile court must find that a substantial risk of detriment exists. (*In re Heather B.* (1992) 9 Cal.App.4th 535, 560-561 [discussing identical presumption under former section 366.21, subdivision (f)].) "Since court-ordered treatment programs are tailored by the court to remedy the circumstances that required removal of the child from parental custody, it is reasonable to conclude that in the absence of contrary evidence the failure to participate in such programs is sufficient to establish that the circumstances still exist." (*Heather B.*, at p. 561.) But if the parent introduces "contrary evidence[,] . . . then the presumption has no further effect and the matter must be determined on the evidence presented." (*Ibid.*) At no time does the presumption shift the burden of proof on the ultimate issue to be proven, which always remains with the agency. (*Ibid.*)

Whether the juvenile court has properly applied an evidentiary presumption is a legal question we review de novo. (*In re Quentin H.* (2014) 230 Cal.App.4th 608, 613-614.)

Mother argues that the juvenile court erroneously relied on the statutory presumption even though she produced "evidence of participating in court-ordered treatment programs," so that the presumption had "no further role" to play under *In re Heather B.*, *supra*, 9 Cal.App.4th 535. We agree with mother that she adequately rebutted the presumption by presenting " 'evidence . . . which would support a finding of [the] nonexistence' " of a substantial risk of detriment, particularly given the testimony and supporting documents she submitted to establish her participation in services both while incarcerated and since March 2014. (*In re Quentin H.*, *supra*, 230 Cal.App.4th at p. 614, quoting Evid. Code, § 604; see also *Heather B.*, at p. 561.)

But the introduction of this evidence did not, as mother suggests, prevent the juvenile court from considering the evidence of her failure to participate in and benefit from court-ordered treatment programs in deciding the ultimate issue. (*In re Quentin H.*, *supra*, 230 Cal.App.4th at pp. 614-615.) Regardless of the presumption, consideration of "the efforts or progress, or both, demonstrated by the parent . . . and the extent to which he or she availed himself or herself of the services provided" is *required* when

12

determining whether a substantial risk of detriment has been proven. (§§ 366.22, subd. (a), 366.25, subd. (a)(1).) As a result, the court did not err by focusing on evidence of mother's failure to comply with the case plan in ruling that the Agency had proven a substantial risk of detriment.

We also disagree with mother's contention that the juvenile court "rel[ied] upon the presumption as the sole support for its decision" and failed to consider all the relevant evidence to decide whether the Agency had proven a substantial risk of detriment. The court applied the correct legal standard, finding that, "based on the totality of the circumstances, . . . the [Agency] has demonstrated [by a preponderance of the evidence] that return of the children would create a substantial risk of detriment to [their] safety, protection[,] or physical or emotional well-being . . . ."[7] And the court relied on the entire record, stating that it had "read, reviewed[,] and considered all of the social worker's reports" in addition to the evidence presented for the first time at the hearing.

It is true that the juvenile court's references to mother's failure to "rebut" the statutory presumption implied that mother had failed to present contrary evidence. But, reading those references in context, we conclude that the juvenile court simply meant that mother's evidence did not outweigh the Agency's evidence on the ultimate issue whether return would create a substantial risk of detriment, *not* that mother had failed to carry her burden of producing any evidence on which a contrary finding could be made. We conclude that the court did not err in its application of the statutory presumption.

> B.    *Substantial Evidence Supports the Juvenile Court's Finding that the Brothers Would Face a Substantial Risk of Detriment if Returned to Mother's Care.*

Mother contends that substantial evidence does not support the juvenile court's finding that the brothers would face a substantial risk of detriment if returned to her care.

---

[7] Citing this statement, mother also claims that the juvenile court failed to "specify the factual basis for its conclusion that return would be detrimental." Although referring to "the totality of the circumstances," without more, might not have sufficed (see §§ 366.22, subd. (a), 366.25, subd. (a)(2)), the court also discussed at length the circumstances it relied on in reaching its decision.

Although we recognize and commend mother's recent progress, we conclude that the finding was supported by substantial evidence.

As we discussed above, children must be returned to a parent's custody after the 18- or 24-month hearing unless "return . . . would create a substantial risk of detriment to [their] safety, protection, or physical or emotional well-being." (§§ 366.22, subd. (a), 366.25, subd. (a)(1).) The detriment standard, " 'while vaguely worded to be sure, must be construed as a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' It must mean what it says: that return presents a *substantial* risk of detriment to the child." (*Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 505, italics in original.) "We are looking for passing grades here, not straight A's." (*David B. v. Superior Court*, *supra*, 123 Cal.App.4th at p. 790.)

" 'In evaluating detriment, the juvenile court must consider the extent to which the parent participated in reunification services. [Citations.] The court must also consider the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement. [Citations.]' " (*In re E.D.* (2013) 217 Cal.App.4th 960, 966; §§ 366.22, subd. (a), 366.25, subd. (a)(1).) "[T]he decision whether to return a dependent child to parental custody is not," however, "necessarily governed solely by whether the parent has corrected the problem that required court intervention," as long as the detriment at issue is " 'a manifestation of the original basis for dependency.' " (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1344.)

The juvenile court's finding that the brothers would face a substantial risk of detriment if returned to mother's care is reviewed for substantial evidence. (*In re E.D.*, *supra*, 217 Cal.App.4th at p. 966; *Jennifer A. v. Superior Court*, *supra*, 117 Cal.App.4th at p. 1341.) " 'Substantial evidence' means evidence that is reasonable, credible[,] and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1401.) In determining whether substantial evidence supports the court's findings, we "review[] the entire

14

record, . . . resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment[.]" (*In re Monique T.* (1992) 2 Cal.App.4th 1372, 1378.)

Mother argues at length that she was in substantial compliance with her case plan and her efforts adequately addressed the concerns that led to the brothers' removal. We conclude to the contrary that the evidence presented about mother's drug problems and mental health issues constituted substantial evidence that the brothers would face a substantial risk of detriment if returned to her care.

First, as to mother's drug problems, it is true that mother completed substance abuse programs while incarcerated, but the record shows that she failed to enroll in an inpatient or outpatient program after being released, and she tested positive for methamphetamine about six months later. We recognize that not "all relapses are created equal," but mother's September 2013 relapse was not a one-time, relatively minor misstep. (Cf. *Rita L. v. Superior Court*, *supra*, 128 Cal.App.4th at pp. 505-506 [mother took Tylenol with codeine once when she had a headache but was "quite proactive in addressing the lapse" and immediately "resumed her life"].) Mother's positive test precipitated a six-month period in which she stopped drug testing for the Agency and almost entirely stopped participating in the case plan.

Mother's September 2013 relapse was also not her only one. Mother admitted to abusing methamphetamine, heroin, and alcohol following L.B.'s death, and she apparently did not become clean and sober until she was jailed in November 2011. Although the children were not detained on the basis that mother abused these particular substances, her methadone use was a direct cause of L.B.'s death and the children were only removed after she was arrested for a number of crimes, including heroin possession, committed after she relapsed. Mother's substance abuse problem has repeatedly prevented her from meeting her children's needs. The fact that she has sometimes brought it under control does not undermine the juvenile court's finding of a substantial risk of detriment to the brothers if they returned to her care.

Second, as to mother's mental health issues, the record demonstrates mother's difficulty coping with stressful situations and consequent failure to prioritize her children's well-being. After L.B.'s death, mother was understandably grieving deeply. But the Agency's reports depict a parent who was barely functioning and had delegated much of the care of her other children to a questionable caretaker. And mother was persistently unable to follow through on the counseling arranged by the Agency for her and her children despite recognizing the family's desperate need for it. Mother did not begin true individual therapy until almost three years into this case. She testified that she addressed many of her emotional issues while incarcerated, and she argues that this constituted compliance with the case plan's requirement of individual therapy. But by September 2013, mother was pregnant, bouncing between different living situations, and again feeling "overwhelmed." She stopped complying with the case plan and not only did not attend individual therapy, but also failed to participate in dyad therapy with the brothers or visit them in the East Bay. Even after mother got back on track in March 2014, she continued to refuse individual therapy. At the time of the juvenile court's ruling, mother was caring for a high-needs infant, recovering from another abusive relationship, and still facing an uncertain housing situation. Even though mother claimed that she had learned to react better to stressful situations, the juvenile court was entitled to find that the brothers would face a substantial risk of detriment if returned to her care given her history of relapses, inability to cope in times of stress, and only recent willingness to address the underlying issues in individual therapy.

Mother makes a number of other arguments in an attempt to undermine the juvenile court's finding. First, she argues that the brothers' circumstances were different from J.W.'s and that the juvenile court therefore erred because it "never considered the children individually in making its orders" or "the possibility of returning fewer than three children." There is little doubt that J.W. was experiencing significant emotional problems and was more vulnerable than the brothers. That said, the substantial evidence discussed above still establishes that the brothers would face a sufficiently serious risk of detriment if returned to mother's care. Mother's efforts throughout this case have been

16

inconsistent and, while she worked hard to reunify with her children at some times, she essentially gave up at other times. Even if the brothers were in a better position than J.W. to cope with such instability, and even if returning them but not J.W. would make it easier for mother, mother's previous inability to effectively manage stressful situations still constitutes substantial evidence supporting the court's detriment finding.

Mother also suggests that statements made by the brothers' attorney at the hearing and the juvenile court's ruling regarding visitation confirm that return would not pose a substantial risk of detriment to the boys. Their attorney's position about the desirability of increasing visitation is, of course, not evidence. (*In re Ramone R.* (2005) 132 Cal.App.4th 1339, 1352.) And the court's ruling that "[t]he Agency has discretion to return to supervised visitation . . . if [mother] tests positive for drug or alcohol use, or poses a danger to the safety of the child[ren]" is not at odds with the finding that return "would create a substantial risk of detriment to the[ir] safety, protection, or physical or emotional well-being." (§§ 366.22, subd. (a), 366.25, subd. (a)(1).) Returning the brothers to live with mother had the potential to harm their well-being, particularly their emotional well-being, in a way that visits of several hours simply did not.

Mother also argues that the juvenile court improperly considered her "homelessness" and the brothers' good relationship with their foster family. (See *In re Yvonne W.*, *supra*, 165 Cal.App.4th at pp. 1401-1402 [parent's "limited financial resources, which require her to live in a shelter until she can obtain alternative housing, are not a legitimate ground for finding detriment"]; *Rita L. v. Superior Court*, *supra*, 128 Cal.App.4th at pp. 507-508 [child's relationship with de facto parents not relevant to determination whether to terminate reunification services].) We question whether the court's equivocal comment that mother's "housing situation is and was precarious; however, it is more stable now," establishes that the court relied on her housing status when ruling. It is even less clear that stray remarks about L.L.B.'s satisfaction with his foster home, made when the court was finding him a credible witness, establish that the court relied on that circumstance. But even if any error occurred, we conclude it was

harmless since the substantial other evidence discussed above supports the court's finding that the brothers would face a substantial risk of detriment if returned to mother's care.

Finally, mother contends that the Agency failed to include a discussion of the brothers' relationships with their sisters in the reports filed between May 2013 and July 2014, as required under section 366.1, and this prevented the juvenile court from "properly consider[ing] the sibling relationships." Section 366.1, subdivision (f) requires that each supplemental report include an array of information about a child's relationship with his or her siblings, and the Agency concedes that the supplemental reports it filed "did not explicitly follow the outline set forth" in the statute.[8] We agree with the Agency, however, that mother forfeited this argument by failing to object to the reports' contents below. (See *In re Crystal J.* (1993) 12 Cal.App.4th 407, 411.) Moreover, mother had an opportunity to introduce any evidence about the sibling relationships that she believed was missing from the record, and she does not identify any specific information that would have changed the court's ruling. As a result, even if an error occurred, it was harmless.

---

[8] Section 366.1, subdivision (f) provides in full that supplemental reports must discuss: "(1) Whether the child has any siblings under the [juvenile] court's jurisdiction, and, if any siblings exist, all of the following: [¶] (A) The nature of the relationship between the child and his or her siblings. [¶] (B) The appropriateness of developing or maintaining the sibling relationships pursuant to Section 16002. [¶] (C) If the siblings are not placed together in the same home, why the siblings are not placed together and what efforts are being made to place the siblings together, or why those efforts are not appropriate. [¶] (D) If the siblings are not placed together, the frequency and nature of the visits between siblings. [¶] (E) The impact of the sibling relationships on the child's placement and planning for legal permanence. [¶] (2) The factual discussion shall include a discussion of indicators of the nature of the child's sibling relationships, including, but not limited to, whether the siblings were raised together in the same home, whether the siblings have shared significant common experiences or have existing close and strong bonds, whether either sibling expresses a desire to visit or live with his or her sibling, as applicable, and whether ongoing contact is in the child's best emotional interests."

## III.
### DISPOSITION

Mother's petition for an extraordinary writ is denied on the merits. The decision is final in this court immediately. (Cal. Rules of Court, rule 8.452(i), 8.490(b)(2)(A).) Mother's request for a stay of the juvenile court's January 5, 2015 hearing is denied as moot.

_____
Humes, P.J.

We concur:


_____
Margulies, J.


_____
Dondero, J.