Filed 3/5/15  In re I.H. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re I.H., a Person Coming Under the Juvenile Court Law. | B257863 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>VERONICA P.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK70493) |

APPEAL from orders of the Superior Court for the County of Los Angeles. Robert S. Draper, Judge.  Affirmed.

Marsha F. Levine, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

## SUMMARY

The mother in this dependency case appeals the juvenile court's orders denying her petition under Welfare and Institutions Code section 388[1] without a hearing, and terminating parental rights to her daughter, I.H.  We affirm the orders.

## FACTS

On May 23, 2012, the dependency court took jurisdiction over I.H., who was then about one year old.  Mother had failed to provide adequate parental supervision, as reflected in several incidents that endangered I.H.'s physical safety.  I.H. remained at home with her mother under the supervision of the Los Angeles County Department of Children and Family Services (Department), with family maintenance services and other orders in place, including drug and alcohol testing.  The details appear in our unpublished opinion affirming the dependency court's jurisdictional order.  (*In re I.H.* (Dec. 6, 2012, B241649).)

As we explained in our earlier opinion, when I.H. was born in May 2011, mother was receiving family reunification services with respect to I.H.'s older sister Nadia (then six years old).  Nadia had been adjudicated a dependent of the court in October 2010 (after mother had successfully reunited with her in an earlier proceeding in 2008), based on allegations of mother's drug abuse and history of mental and emotional problems.  Mother had a drug relapse in October 2011, but after that incident immediately re-enrolled in a substance abuse program.  (*In re I.H., supra,* B241649, at p. 2.)

On September 21, 2012, while mother's appeal of the jurisdictional order with respect to I.H. was pending, the Department filed a supplemental petition under section 387.  The petition alleged mother had a five-year history of substance abuse; was a current user of methamphetamine; and was under the influence of illicit drugs on September 17, 2012, while I.H. was under her care and supervision.  The petition also alleged mother physically abused I.H.'s sister Nadia, "by striking the child's mouth with the mother's fingers" and pushing Nadia to the floor, and that Nadia did not want to

---

[1]  All statutory references are to the Welfare and Institutions Code.

2

return to mother's home.  The court found continuance in the home of mother was contrary to I.H.'s welfare, and made other orders, including weekly drug testing and monitored visitation.

Mother failed to submit to a scheduled drug test on September 26, 2012, but tested negative for illegal drugs four times in October 2012, and the record shows no positive drug test results thereafter.  As of September 20, 2012, mother enrolled in an outpatient program providing substance abuse, anger management and parenting education classes, as well as monthly random drug testing and individual counseling.

On November 2, 2012, the juvenile court sustained the section 387 petition and removed I.H. from mother's custody.  (At the same time, in Nadia's case, the court terminated family reunification services and set a hearing to select a permanent plan. Mother's parental rights to Nadia were later terminated.)  Among other things, the court ordered counseling, including an inpatient drug program, and ordered the Department to provide mother with referrals for inpatient drug programs (which it did on November 15, 2012).  As of February 1, 2013, mother remained in her outpatient program, and had been on the waiting list for an inpatient bed since November 19, 2012.  Her progress was good.

In a report prepared for a review hearing on May 3, 2013, the Department recommended termination of reunification services for I.H. and calendaring of a hearing on a permanent plan.  The Department's report reviewed mother's history of substance abuse leading to the loss of custody of Nadia, and her "failure to comply with the court-ordered programs and with DCFS," noting the various remedial services mother had received that had "failed to resolve these issues in that the mother continues to relapse." The report stated mother was "able to maintain a substantial period of sobriety until she is faced with a stressor which she is unable to cope with and relapses," referring to mother's relapses in October 2011 and September 2012.  (In the latter instance, mother told the Department she was " 'stressed' about not being able to locate a [Dyadic] parenting program.")  The Department's report also indicated mother had "ongoing mental health issues" and was diagnosed with "bipolar, PTSD, and anxiety"; the Department had "concerns as to mother's non-compliance with her psychotropic medication and

3

individual therapeutic services." (Mother had been a client at a mental health services clinic, but her case was closed on October 30, 2012, and mother did not provide any information to the social worker as to where or if she was currently being treated or taking her medication.) The social worker had had little contact with mother since early December 2012, despite numerous efforts.

On May 3, 2013, the court continued the matter for a contested review hearing, which, after further continuances to August 2 and October 30, 2013, was eventually held on February 10, 2014. The report for that hearing stated that mother was in partial compliance with the court ordered programs. The Department expressed the same concerns described in its May 2013 report, and added: "Mother does not appear to be sincere in complying with the court, maintaining sobriety consistently, participating in a program and reunifying. Once again, mother enrolled in an inpatient drug program prior to her last court hearing to demonstrate compliance. However, the Department does not recognize mother's last minute efforts as genuine or proof of compliance because she has been well aware of the Department's expectation of her for over a year." For those reasons, and because of mother's history with Nadia (previous reunification, followed by another detention and failure to reunify) and I.H.'s young age, the Department again recommended termination of reunification services.

Meanwhile, mother had enrolled in another outpatient drug program on September 16, 2013, and on October 18, 2013, was transferred to the inpatient drug program. She successfully completed the 90-day primary phase of the drug treatment program as of January 16, 2014, and was discharged on February 1, 2014.

At the February 10, 2014 hearing, mother's counsel told the court he had advised mother to make a section 388 motion "closer to the [section 366].26 hearing when she has appropriate housing and when she is further along in services." The court then told mother that it "recognize[d] that you have made a lot of progress," and: "What I need you to do is continue doing what you are doing, and I will set another hearing in 120 days to address whether we should order [I.H.] into a permanent plan. That would likely be adoption, but, before that date, you can file a 388 and request reunification services be

4

reinstated. So understand that is still an option for you, so it is important that you continue with what progress you have made."

The court concluded: "Mother has, for the most part, substantially complied with the case plan. She still has things she needs to do and her housing situation is not stable. . . . [W]e are at a [section 366].22 date, so family reunification services are terminated. There is little likelihood at this time that further services would result in a different outcome." Over the Department's objection, the court ordered unmonitored visitation starting at two hours, to be lengthened by one hour every other week if mother continued to comply with her case plan.

On May 19, 2014, mother filed a section 388 petition, asking the court to change its February 10, 2014 order terminating reunification services, and instead to "issue a Home of Parent Mother order with Family Maintenance Services" or other appropriate relief. The petition stated that the order should be changed because mother had completed a residential drug treatment program, and she addressed her mental health issues by attending individual counseling "and is more able to identify and implement coping skills to reduce her daily stressors." The petition said she had been treated for her mental health conditions, had obtained stable housing for herself and I.H., maintained her sobriety in an outpatient program, and participated at Clear Path Counseling Center where she completed 113 sessions in various subjects. (These 113 sessions were completed as of July 27, 2012, well before I.H. was removed from mother's custody.)

Mother stated that the requested home of parent order with family reunification services would be better for I.H. "so that the child can continue her bond with her Mother and remain in the family where she is more likely to have a sibling relationship with her sister, . . . and maintain family ties with her biological family."

On June 3, 2014, the trial court denied the section 388 petition without a hearing, because the petition did not "state new evidence or a change of circumstances in light of mother's past history with this child and Nadia," and the proposed change of order "does not promote the best interest of the child."

5

The Department's status review report on May 29, 2014, prepared for the permanent plan hearing, indicated that mother did not take advantage of the court's order for unmonitored visitation until April 2014 (but she continued to visit every Saturday with I.H. at the caretakers' home). Mother began her unmonitored visits in April, and in May increased the time spent in those weekly visits to as much as eight hours. The report also indicated that I.H. had remained placed with her caretakers since September 18, 2012. They continued to provide I.H. with "a safe, stable, and nurturing home environment." The caretakers "are very affectionate and loving towards [I.H.] and vice versa," I.H. was "very bonded with caretakers and their family," and " '[I.H.] has become part of the [caretakers'] family.' "

Mother testified at the permanent plan hearing, held July 21, 2014. She said that while she was in the inpatient drug program, her monitored visits with I.H. were good, and I.H. "would always be there with me instead of wanting to go play." Her visits then were two to three hours long, and she would color with I.H., play with her and bring food for her. When Nadia did not visit, I.H. would ask about her. I.H. called mother "Mommy 'Vekena' " because she could not say "Veronica."

Mother said she had been having unmonitored visits since February 2014, and "[n]ow they are up to 13 hours" a week. She said she and I.H. spend a lot of time traveling on the bus; they go to various places, including to see Nadia, where they would stay for three or four hours, "so that they can also have their relationship as well." When they visit Nadia, I.H. sometimes asks why they have to leave. Mother said she prepares I.H.'s meals, does potty training, and teaches I.H. her colors and numbers and how to spell.

Mother testified she wanted I.H. returned to her "because I feel . . . I have changed. . . . I want her to be able to continue her relationship with her sister, as well as with myself. . . I feel that I can be there for her the way that I couldn't for my other daughter. And really, most importantly, like I said, I don't want them to lose contact with each other more than anything." She described her present relationship with I.H. as "really good. [W]hen I see her, she runs up to me, so I know that has to mean something

6

there, you know. She is really good about being around me. When I tell her it is time to go, . . . she always complains about it. She doesn't want to."

After hearing argument, the juvenile court terminated parental rights. The court observed that "mother's . . . progress in programs or even success in programs is not sufficient to change an otherwise required result at a [section 366].26 hearing. [¶] I think there is no question the child is adoptable. She has been with her current caregivers since September 18, 2012. I think the question whether there is a parental bond between the mother and child is a close question because, certainly, 13 hours of unmonitored visits and mother's testimony, without reference to the other evidence, would seem to indicate some form of bond. [¶] On the other hand, there is additional evidence going the other way, but I think the basic issue here, basic reason for the court's decision is this child deserves permanency and stability, and while mother seems to be making progress now, she seemed prior times to be making progress, and I don't find it would be in the best interest of the child. In fact, I find it would not be in the best interest of the child to give up her stability with her prospective adoptive parents and placing her in legal guardianship, so I am going to make the findings."

Mother filed a timely notice of appeal from the juvenile court's order terminating parental rights, and also identified the section 388 order as an appellate issue.

**DISCUSSION**

**1.      The Section 388 Issue**

Under section 388, a juvenile court order may be changed or set aside "if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) "[I]f the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition." (*Ibid.*; § 388, subd. (d) ["If it appears that the best interests of the child . . . may be promoted by the proposed change of order . . . , the court shall order that a hearing be held . . . ."].) The prima facie

7

requirement is not met "unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*In re Zachary G.,* at p. 806.) We review the court's order denying a hearing for abuse of discretion. (*Id.* at p. 808.)

Mother contends the juvenile court abused its discretion and improperly relied on mother's past history "instead of focusing on the significant progress and changes mother had made." We need not decide whether the court erred in finding no substantial change in circumstances, because the petition failed to show that I.S.'s best interests would be promoted by placing I.H. with mother.

*In re Angel B.* (2002) 97 Cal.App.4th 454 (*Angel B.*) is instructive. There, the mother, with a long history of drug abuse, rehabilitation attempts without permanent success, and failure to reunify with another child, was denied reunification services. Nonetheless, she "did begin to do better," enrolling in a treatment program, testing clean for four months, completing various classes and obtaining employment, and having regular visits with her child that went well. (*Id.* at p. 459.) When she then petitioned the court under section 388 to grant her supervised custody or reunification services, her petition was summarily denied without a hearing. The Court of Appeal affirmed that order, finding no abuse of discretion in the refusal to hold a hearing. (*Id.* at p. 462.)

*Angel B.* acknowledged the petition showed the mother was doing well, "in the sense that she has remained sober, completed various classes, obtained employment, and visited regularly with [the child]." (*Angel B.,* 97 Cal.App.4th at pp. 464-465.) The court also assumed for purposes of the appeal "that this time her resolve *is* different, and that she will, in fact, be able to remain sober, remain employed, become self-supporting and obtain housing." (*Id.* at p. 465.) Even so, the court concluded, "such facts are not legally sufficient to require a hearing on her section 388 petition." (*Ibid.*) The court explained:

"[T]here is a rebuttable presumption that, in the absence of continuing reunification services, stability in an existing placement is in the best interest of the child, particularly when such placement is leading to adoption by the long-term caretakers. [Citation.] To rebut that presumption, a parent must make some factual showing that the

8

best interests of the child would be served by modification." (*Angel B., supra,* 97 Cal.App.4th at p. 465.) The mother in *Angel B.* did not make such a showing, and neither did mother here.

Mother's petition stated only that an order placing I.H. with mother "will be better for the child so that the child can continue her bond with her Mother and remain in the family where she is more likely to have a sibling relationship with her sister, Nadia [] and maintain family ties with her biological family." This is simply a conclusory statement, not a factual showing that returning I.H. to mother would promote I.H.'s best interests. (Cf. *In re Ramone R.* (2005) 132 Cal.App.4th 1339, 1348, 1349 ["allegations of her [section 388] petition were to be liberally construed, but conclusory claims are insufficient to require a hearing"; the mother conceded her claim that the child would benefit from contact with her was merely conclusory].)

Here, I.H. was just three years old when the court denied mother's section 388 petition. She had been with her caretakers for over 20 months in a nurturing environment and was "very bonded with caretakers and caretaker's children." Mother's petition offered no evidence of the nature of her own bond with I.H., merely pointing out she had unmonitored visitation with I.H. (Even if we were to consider mother's later testimony at the termination hearing about her relationship with I.H. – "[W]hen I see her, she runs up to me," and "[w]hen I tell her it is time to go, . . . she always complains about it" and "doesn't want to" – it would be to no avail. That testimony would not rebut the presumption that the stability of I.H.'s current placement, with caretakers (and prospective adoptive parents) with whom she has lived since the age of 16 months and to whom she is "very bonded," is in her best interests. (See *Angel B., supra,* 97 Cal.App.4th at p. 465 [the mother's petition, denied without a hearing, stated that she had bonded with the child, who was happy to see her and reached for her on their visits].)

Under these circumstances, as in *Angel B.*, "no reasonable trier of fact could conclude that the bond, if any, [the child] feels toward Mother (as opposed to the bond that *Mother* feels toward [the child]) is that of a child for a parent." (*Angel B., supra,*

9

97 Cal.App.4th at p. 465.)  In short, as in *Angel B.*, mother made no prima facie showing that I.H.'s best interests would be served by placing her with mother.

**2.      Termination of parental rights**

**a.      The beneficial relationship exception**

Under section 366.26, subdivision (c)(1)(B)(i), if the juvenile court determines, by a clear and convincing standard, that it is likely a child will be adopted, "then it *shall* terminate parental rights and order the child placed for adoption *unless* the court finds a compelling reason for determining that termination would be detrimental to the child. One such reason is that the parent has maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship."  (*Angel B., supra,* 97 Cal.App.4th at p. 466; see § 366.26, subd. (c)(1)(B)(i).)

"To overcome the preference for adoption and avoid termination of the natural parent's rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed.  [Citations.]  A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.  [Citation.]  A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent.  [Citation.]"  (*Angel B., supra,* 97 Cal.App.4th at p. 466.)  The relationship with the natural parent must "promote[] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

"The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond.  The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond."  (*Autumn H., supra,* 27 Cal.App.4th at pp. 575-576.)

10

Mother contends there was insufficient evidence to terminate her parental rights, and a "wealth of evidence" that her relationship with I.H. was "strong enough to benefit the child and . . . would cause detriment if terminated." She points out she consistently visited I.H.; her visits were unmonitored and of "considerable duration"; and the court recognized that the visits and mother's testimony "without reference to the other evidence, would seem to indicate some form of bond."

We cannot agree with mother's conclusion. Giving full credence to mother's testimony, it established only that she maintained "regular visitation and contact" with I.H.; mother plainly failed to establish that I.H. "would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) Mother fails to recognize that the "benefit from continuing the relationship" must rise to the level of "a *substantial*, positive emotional attachment such that the child would be *greatly* harmed" by the loss of the relationship. (*Angel B., supra,* 97 Cal.App.4th at p. 466, citing cases.) It was mother's burden to establish that I.H. would be "greatly harmed," and she did not do so.

Again, this case is much like *Angel B.* At the time of the hearing, I.H. was very young, just over three years old. She had spent the previous 22 months of her life with her caretakers – as in *Angel B.*, spending "relatively few hours visiting with Mother, versus many hours being parented by the foster family . . . ." (*Angel B., supra,* 97 Cal.App.4th at pp. 467-468.) As in *Angel B.*, the mother and child's "interactions have been positive, but nothing in the record indicates that, from [the child's] point of view, the interactions were particularly like those of a child with her mother; and . . . there is no evidence that [the child] has any particular needs that can be met by Mother but not by the foster family." (*Id.* at p. 468.)

In sum, when a child is adoptable, the parent cannot establish the exception "simply by demonstrating some benefit to the child from a continued relationship with the parent, or some detriment from termination of parental rights." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1349; *id.* at p. 1350 ["it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement"].) In this case, there was nothing in the record before the juvenile

11

court to suggest that I.H. would be harmed in any way if her visits with mother were to end. Accordingly, the juvenile court did not err by refusing to apply the exception and terminating mother's parental rights.

### b. The sibling relationship exception

Another exception exists to the mandate that the juvenile court terminate parental rights when a child is adoptable: if termination would be detrimental to the child because of "substantial interference with a child's sibling relationship . . . ." (§ 366.26, subd. (c)(1)(B)(v).) A finding of substantial interference must "tak[e] into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (*Ibid.*)

The language of the sibling relationship exception creates "a heavy burden for the party opposing adoption." (*In re Naomi P.* (2005) 132 Cal.App.4th 808, 823.) And, "even if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption. [Citation.]' [Citation.]" (*Ibid.*)

Mother argues on appeal that the sibling relationship exception should have been applied in her case. We disagree.

This is what occurred at the hearing. At the outset, mother's counsel told the court, just before mother testified, that mother was trying to establish the parent/child beneficial relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)). Then, during argument, the Department's counsel suggested that Nadia was no longer I.H.'s sibling. This exchange occurred:

> "[DEPARTMENT'S COUNSEL]: [¶] . . . [¶] Also, something was made of [I.H.]'s sibling, and I would just argue that because of the termination of parental rights [to Nadia] prior to February, technically, that is not her sibling, but,

12

just as far as for the purpose of arguing that there would be a substantial interference with a sibling, that really, at this point, really cannot be argued because –

"THE COURT:  The sibling is no longer her child.

"[DEPARTMENT'S COUNSEL]:  It is no longer a sibling, right, as far as Nadia is not technically [I.H.]'s sibling . . . .  And I'm only bringing that up because I know the mother indicated there was some information as far as what occurred during these visits and that there was some contact between Nadia and [I.H.].  I don't think there is enough for the court to – even if the court were to feel that they are siblings – that there is enough to invoke that exception to stop termination of parental rights.  Also, on that part, essentially, those are play dates."

Mother's counsel then argued, repeating that mother was "asserting the parental/child relationship exception" to termination of parental rights, and arguing that mother "continued to act as a parent" with I.H., including "putting her in a situation so that she has contact with her other relatives and family; namely her sister, who she has a relationship with."  The court interrupted to say, "Mother's parental rights have been terminated as to her sister."  Mother's counsel agreed, and said:  "Technically, given the fact that her parental rights have been terminated, she would not be a sister by law; however, the relationship between Nadia and [I.H.] would be nothing less than a sibling relationship.  These two children have lived together, and they are just as much siblings as the foster children who currently live in the home with [I.H.] are to her."  Counsel then argued that the relationship was substantial, based on mother's testimony that I.H. misses her sister and does not understand why they have to leave when they visit.

When the court announced the reasons for its ruling (quoted *ante*, at p. 7), the court did not refer to the sibling relationship exception,  but in making its order stated: "The court finds it would be detrimental to the child to be returned to the parents.  Court finds that no exceptions to adoption apply in this case . . . ."

Against this factual backdrop, mother contends that (1) the juvenile court erroneously found that the sibling relationship exception could not apply because

13

mother's parental rights to Nadia had been terminated; (2) the court therefore failed to give due consideration to mother's contention that the sibling relationship exception applied; and (3) there was substantial evidence to support applicability of the exception. Mother is mistaken.

First, it is not entirely clear that the juvenile court accepted the assertions – from both counsel – that "technically" I.H. and Nadia were not siblings. Of course, they are biological siblings, though mother no longer has a relationship with Nadia. (See *In re Miguel A.* (2007) 156 Cal.App.4th 389, 394 ["an order terminating parental rights has no effect on the relationships between the child and other biological relatives"]; *In re Valerie A.* (2006) 139 Cal.App.4th 1519, 1524 ["children separated by the dependency process do not cease to be brothers or sisters for purposes of preserving relationships important to all of the affected children"]; but see *In re Erik P.* (2002) 104 Cal.App.4th 395, 403 ["[w]here the parents' continuing relationship with the dependent child, or absence thereof, can in no way affect the nature of the sibling relationship because the parent no longer has a relationship with the sibling, the exception does not apply"].)

Second, we are inclined to agree with the Department that mother's counsel did not raise the issue of I.H.'s relationship with Nadia as a separate claim, but rather as support for mother's claim that continuing the parental relationship would benefit I.H. (Counsel argued mother acted as a parent by caring for I.H., feeding her, changing her, and "putting her in a situation so that she has contact with . . . her sister . . . .") Notably, counsel presented virtually no evidence pertinent to any of the factors, specified by statute, that a court must consider in assessing whether termination of parental rights would interfere substantially with a sibling relationship. (See *In re Erik P. supra,* 104 Cal.App.4th at p. 403 [father waived his right to raise the sibling relationship exception; "[i]f a parent fails to raise one of the exceptions at the hearing, not only does this deprive the juvenile court of the ability to evaluate the critical facts and make the necessary findings, but it also deprives this court of a sufficient factual record from which to conclude whether the trial court's determination is supported by substantial evidence"].)

Third, even if mother did not waive her right to raise the sibling relationship exception on appeal, the record does not support application of the exception as a matter of law. The record contains no evidence that I.H. was "raised with a sibling in the same home . . . ." (§ 366.26, subd. (c)(1)(B)(v).) Nadia was removed for the second time before I.H. was born, and I.H. has been with her caretakers since the age of 16 months. There is no evidence that I.H. "shared significant common experiences or has existing close and strong bonds" with Nadia. (*Ibid.*) The only evidence was mother's testimony that Nadia was often present during mother's visits with I.H.; when Nadia did not visit, I.H. would ask about her, and when they visited Nadia, I.H. would sometimes ask why they had to leave. That evidence is plainly insufficient to show that continued contact with Nadia was "in [I.H.]'s best interest, including [I.H.]'s long-term emotional interest, as compared to the benefit of legal permanence through adoption." (*Ibid.*; see *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952 [child had lived with her sibling most of their lives, loved him and would miss him and worry about his safety; court found "no evidence [the child], other than being sad, would suffer detriment if the relationship ended"].)

As with the other exceptions to the legislative preference for adoption, the sibling relationship exception " 'merely permit[s] the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption.' [Citation.]" (*In re Naomi P, supra,* 132 Cal.App.4th at p. 822.) Mother failed to demonstrate any exceptional circumstances here, and there was accordingly no error in the termination of her parental rights.

## DISPOSITION

The orders are affirmed.

GRIMES, J.

We concur:

RUBIN, Acting P. J.                    FLIER, J.

15