Filed 8/10/22  In re J.W. CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| In re J.W., A Person Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH AND SOCIAL SERVICES DEPARTMENT,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>L.W.,<br><br>　　　Defendant and Appellant. | A163517<br><br>(Solano County<br>Super. Ct. No. J45042) |

Appellant L.W., J.W.'s paternal grandmother, filed a petition in J.W.'s dependency under Welfare and Institutions Code[1] section 388 seeking placement of J.W. and increased visitation with him.  The juvenile court denied the petition insofar as it sought placement but ordered increased visitation, and selected adoption as J.W.'s permanent plan.  L.W. argues that the juvenile court applied incorrect legal standards because it erroneously believed it could not issue a visitation order that would survive termination of its jurisdiction and that it should have selected legal guardianship and not adoption as J.W.'s permanent plan.  We affirm.

---

[1] Further statutory references are to the Welfare and Institutions Code.

1

## BACKGROUND

On August 20, 2020, mother R.B., father J.W. Jr., and then 1-year old J.W. were in a parked car when unknown assailants fired approximately 30 shots into the vehicle. Both parents were killed and J.W. was seriously injured and taken to the hospital, where he remained for several days.

On August 25, the Solano County Health and Social Services Department filed a dependency petition under section 300, subdivision (g), alleging that J.W. was without a care provider who could make medical decisions on his behalf.

A jurisdiction and detention hearing was set for October 6, in advance of which the department filed a jurisdiction and detention report. The report indicated that J.W. had been placed with his maternal aunt, M.B., after he was released from the hospital on August 27. The report further indicated that M.B. had completed the process for emergency placement, and that she had completed all the components of the full Resource Family Approval process, and would be fully approved after completing the required interviews with the social worker. The report also stated that L.W. had recently begun the process to obtain Resource Family Approval. The report recommended that the juvenile court sustain the allegations of the petition and set a section 366.26 hearing.

The jurisdiction and disposition hearing took place on October 27. The juvenile court sustained the allegations of the petition, adjudicated J.W. a dependent, and set the matter for the selection and implementation of a permanent plan under section 366.26 on February 23, 2021.

On March 26, 2021, L.W. filed a section 388 petition using Form JV-180. She indicated that she was interested in having J.W. placed in her home, and alleged as changed circumstances that she had completed the

2

Resource Family Approval process and received her certificate. The petition also alleged that she had become aware that M.B. "is seeking to adopt and is unwilling to allow [J.W.] contact with the paternal grandmother or other paternal relatives." The petition requested "increased visitation between [J.W.] and the paternal grandmother with the goal of transitioning [J.W.] back to the paternal grandmother's care."

A combined hearing under section 366.26 and on L.W.'s section 388 petition was held on June 11, June 14, June 30, July 21, July 22, and July 23, with testimony from six witnesses, including L.W. and M.B.

At the conclusion of the hearing, the juvenile court ruled as follows:

"THE COURT: Okay. Well, this is our sixth day in this case. I have heard as much as I need to hear in order, I think, to decide this case.

"I am disappointed that this contest has occurred, because, well, I don't think it's helped anybody, and particularly not [J.W.], okay, because with— I'm concerned that the level of communication between the parties has not been enhanced, but maybe has been threatened or changed in some way. And I don't want to see that happen. Okay. And I want everybody to understand that communication between you is really important, okay, if you want to help [J.W.] Okay.

"I know I want to help [J.W.] Okay. And that's what I'm going to try to do here now.

"With regard to the JV-180, yes, the burden of proof is on [L.W.] to prove by a preponderance of the evidence that there's been a change of circumstances; and that a change of placement would be in [J.W.]'s best interests and a change in—or that visitation also would be in his best interests.

3

"It's conceded here that there is a change of circumstances. And that change of circumstances is that the RFA approval was given to [L.W.] and that she was denied placement. Okay.

"No, I don't think that she's met her burden of proof to show the allegation that [M.B.] is intending to entirely cut her and the paternal family off from any contact. Okay. So I'm making that finding.

"But there is a change of circumstances.

"And then that brings me to what's in his best interests. Okay. And I guess the initial question is: Is it in his best interests to change his placement, which currently is with [M.B.]

"And, well, the answer is clearly: No, it's not. Even [L.W.], by implication, anyway, concedes that changing his placement at this time is not in his best interests, by any stretch of the imagination. This child, who has suffered an incredible trauma, okay, as well as all family members have also experienced the trauma, but, I mean, he was in the car, riddled with bullets, he's still got two bullets in him, and that happens when he—well, he had just turned one year old. This poor little guy.

"In any event, yeah, it's—this is quite a difficult situation.

"He's been in [M.B.]'s care, okay, for almost a year now. And by all accounts, there's no evidence that he's not doing anything other than thriving. Okay. He has done exceptionally well. And [M.B.] is to be commended for the very fine care that she has taken of this little guy and the progress that he's been able to make. So, no, the request for change of placement, at least at this point, is denied, that portion of the JV-180.

"But there's another portion of the JV-180, which is to increase the time that [J.W.] has with his paternal grandmother. And, well, it's become pretty clear that, well, the time we're talking about is not just with his

4

paternal grandmother; it's with his entire paternal side of his family, is what we're talking about here. And I have to say, [L.W.] is not in an enviable situation, because she then becomes the person who has to determine who spends time with [J.W.] and when. Not a great place to be in, [L.W.] Okay. But you seem to have taken this on, okay, willingly. Okay. And, well, even technically speaking, well, there's nothing before me in this matter that has anything to do with anybody else other than [L.W.] But what I'm saying is that I'm acknowledging that the time that you have or that I order with [J.W.] is going to be spent with his other relatives on that side of the family. I recognize that. Okay. And I'm taking that into consideration, particularly into consideration with how much time needs to be spent with his brother.

"Now, with regard to that, I have some real concerns, okay, with what I've heard here. The first thing I'm concerned about is the allegations going back and forth about cooperation or lack thereof. And I want to make it clear that my impression, after hearing from both [L.W.] and [M.B.], is that the picture that's being painted is not accurate. My conclusion, after hearing [L.W.], is that she is a sincere, responsible person who has worked hard to cooperate, okay, with this very difficult situation; and that she's not unreasonable in her requests. I have exactly the same impression from [M.B.] And I have to indicate that, in fact, I think that [M.B.] has gone above and beyond what I have seen in my experience with people who are dealing with these types of issues. I think that she is a reasonable, responsible adult who has worked hard, okay, to accommodate and to communicate and to facilitate frequent and continuing meaningful contact.

"You're going to hear me say this over and over and over again. And the reason you're going to hear me say that is because that's not only what's in the best interests of [J.W.], it's what's in the best interests of all children,

5

to have frequent and continuing meaningful contact with their relatives. I don't think anybody in this courtroom would dispute that.

"The question is: What does that look like? What are the—what's the schedule? And that's the problem, okay, because that's why you're here, right, is that, well, you guys can't agree on what that schedule would be and what frequent and continuing meaningful contact should look like. And revolving around that issue are a number of details, aren't there? All right. All right. And everybody has a different view of what that should be.

"I'm going to start at the hard end of this question, okay, and then work my way backwards.

"The overnight question. Ultimately, that needs to happen. It does. Really, what—from the best I can figure out, the only dispute is, well, when? And [L.W.] acknowledges that to just immediately go into it is not a good idea; that there needs to be an easing into this, so that [J.W.] can adjust to it. Now, children adjust all the time to schedules when they're in different households. It's just a fact of our society. Okay. We see it all the time in our family courts. Okay. And, well, I don't think there are any child experts out there, psychological experts, that would say that it's in any way harmful, just the fact of having a split schedule for a child. I think they all agree that there has to be a home base; that there needs to be stability; and that the children need to understand and feel comfortable with the structure.

"Now, I can tell you right now that I'm not comfortable with the current state of the evidence as to whether or not overnight visitations are or are not in [J.W.]'s best interests. The opinions expressed by both the social worker and the therapist—and the therapist is second-hand, okay, and I have no specifics regarding that opinion. Particularly, I have no opinion from anybody, including [J.W.'s counsel], as to when overnight visitations would be

in his best interests. And I certainly have no opinion that it would never be in his best interests. So, once again, we're right down to when.

"Now, it seems to me that, well, we're not going to know what kind of reaction we may or may not get from [J.W.] unless and until, well, it's tried. So my ruling is going to be an easing into this, with ultimately an overnight being attempted.

"Again, the schedule is something that is kind of up in the air at this point. Do I think I need to order a complete evaluation by a child psychologist to come up with this? I don't think so, not at this point. I'll tell you what, depending on how it goes, I'll keep that open.

"Now, [J.W.'s counsel] is absolutely correct.[2] This isn't a custody order. It's not an exit order out of a dependency case. This is a Band-Aid that I'm going to try to put on this situation to encourage and facilitate more meaningful contact with the paternal side of the family. Okay.

"Now, do I think that six hours three days a month is sufficient? No, I don't. And I don't like the weekday thing. And the reason I don't like the weekday thing is that, well, if I'm going to promote contact with this family, I mean, most families have weekends off. And what I heard from [L.W.] was that, well, she can adjust her work schedule so that she wasn't working on the weekends. And, well, the weekends are what we call quality time. [M.B.] probably knows that better than anybody right now, because during the week there's all kinds of things that she's got to do, okay, with regard to her

---

[2] As part of her argument that a detailed visitation schedule was not required, J.W.'s counsel had argued: "This is not a custody case. There are not exit orders being entered. The Court is not terminating jurisdiction. There is no need at this point to be specific with the detailed schedule."

daughter, with regard to the medical appointments, and with regard to all of the other things that have to be taken care of during the week."

The juvenile court went on to set a visitation schedule whereby L.W. was to have visits with J.W. on alternating weekends, Saturday and Sunday from 10:00 a.m. to 7:00 p.m., and every Wednesday from 3:30 p.m. until 6:30 p.m. The juvenile court went on: "I'd like to see how this goes, okay, for a couple months. And then I'd be willing to take a look at it and make a determination of whether or not overnights are something that we can try." The court set a two-month review hearing for September 28, 2021.

At the conclusion of the hearing, the juvenile court found by clear and convincing evidence that J.W. was generally and specifically adoptable and designated M.B as the prospective adoptive parent. The court set a permanency plan review for January of 2022.

L.W. filed a notice of appeal.

## DISCUSSION

"A ruling on a section 388 petition is 'committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established. [Citations.]' (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)" (*In re D.B.* (2013) 217 Cal.App.4th 1080, 1088–1089.) We also review the juvenile court's placement decision under section 366.26 for abuse of discretion. (*In re Ramone R.* (2005) 132 Cal.App.4th 1339, 1351.)

L.W. makes two related arguments. First, she argues that the juvenile court abused its discretion by "appl[ying] incorrect legal standards" (*In re Shannon M.* (2013) 221 Cal.App.4th 282, 289), because it "mistakenly believed that it had no power to order grandparents' visitation orders that would be enforceable post-adoption of the child," going on to argue that the

8

juvenile court did in fact have such authority. Next, L.W. argues that the juvenile court could have selected legal guardianship and not adoption as J.W.'s permanent plan under section 366.26 so as "not to veto its own grandparents' visitation order for [J.W.]"

We reject the premise underlying both of these arguments. There is simply no evidence in the record that the juvenile court intended its visitation order to continue in effect post-adoption. To the contrary, the juvenile court expressly acknowledged that the visitation schedule it was ordering was temporary—noting that it was not ordering overnight visits yet because "there needs to be an easing into them," that the visitation "schedule is something that is kind of up in the air at this point," and that the schedule was not a permanent exit order but instead a temporary "Band-Aid." Lastly and most importantly, the juvenile court set a two-month review hearing for the express purpose of revisiting the visitation schedule to see how J.W. was adjusting to it, and if possible, to revise it to include overnight visits. In short, the juvenile court intended its visitation order to last for two months— not forever. We need not decide whether the juvenile court had the authority to enter visitation orders that would survive the termination of its jurisdiction, because nowhere did the juvenile court suggest, expressly or otherwise, any view of whether it had such authority. Accordingly, the record fails to demonstrate any error. (See *J.H. v. G.H.* (2021) 63 Cal.App.5th 633, 644 ["Error on appeal must be affirmatively shown by the record, and '[w]e presume the trial court knew and properly applied the law absent evidence to the contrary' "]; *People v. Stowell* (2003) 31 Cal.4th 1107, 1114 ["[W]e apply the general rule 'that a trial court is presumed to have been aware of and followed the applicable law' "].)

9

L.W.'s brief states that the juvenile court "genuinely believed that the grandmother and aunt, who had placement of [J.W.], should have every other weekend and co-parent [J.W.] to adulthood," that "the court concluded that it would like [J.W.] to be raised by maternal aunt and paternal grandmother equally," and that the court "hoped that its shared custody visitation orders would continue post-termination of jurisdiction." These assertions simply find no support in the record.

L.W. also argues that the juvenile court could have selected legal guardianship as J.W.'s permanent plan under section 366.26, subdivisions (b)(3) and (6), and "should have done so in this case not to veto its own grandparents' visitation order for [J.W.]"

Section 366.26, subdivision (b), provides seven alternatives for the juvenile court to select as the minor's permanent plan, "in the following order of preference: [¶] (1) Terminate the rights of the parent or parents and order that the child be placed for adoption . . . . [¶] . . . [¶] (3) Appoint a relative or relatives with whom the child is currently residing as legal guardian or guardians for the child, and order that letters of guardianship issue. [¶] . . . [¶] (6) Order that the child be permanently placed with a fit and willing relative, subject to the periodic review of the juvenile court under Section 366.3." And "[i]n choosing among the alternatives in this subdivision, the court shall proceed pursuant to subdivision (c)," which provides in relevant part that "[i]f the court determines . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).)

We do not agree that the juvenile court was free to choose a permanent plan other than adoption in this case simply because there were no parental

10

rights to terminate. The juvenile court found by clear and convincing evidence that it was likely J.W. would be adopted, and subdivision (c)(1) thus required that "the court shall terminate parental rights *and* order the child placed for adoption." The fact that termination of parental rights in this case was moot does not mean the statutory preference for adoption could be ignored. As our Supreme Court explained in *In re Celine R.* (2003) 31 Cal.4th 45, 53:

"The Legislature has thus determined that, where possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.] 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.' [Citation.]

"We thus see that if the child is adoptable . . . adoption is the norm. Indeed, the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child. The specified statutory circumstances— actually, *exceptions* to the general rule that the court must choose adoption where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' [Citation.] At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.] The statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption."

11

Furthermore, even if the juvenile court was permitted to choose guardianship in spite of its finding that J.W. was adoptable, we do not agree that it was somehow *required* to do so because of the visitation schedule it ordered, which, as discussed above, was expressly intended to last only two months.

## DISPOSITION

The juvenile court's order is affirmed.

_____
Richman, Acting P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.

*In re J.W.* (A163517)